GRANT and Another *v.* THE LEXINGTON FIRE, LIFE AND MARINE INSURANCE COMPANY.

Insurers can not take advantage of a stipulation in the policy that an action for a loss shall be barred if not brought within a specified period, where they have been mainly instrumental in producing the delay, by holding out hopes of an amicable adjustment.

Policies of insurance are liberally construed in favor of the assured, and an exception is strictly construed against the insurer.

A risk was taken by the defendants upon the cargo of one flat-boat, and part of the cargo of another, owned by the plaintiffs, for a voyage from *Lawrenceburgh* to *New-Orleans.* The boats were loaded with hay.  It was stipulated in the policy that it should be lawful for the boats to touch at intermediate points, with the privilege of coasting and transacting any lawful business connected with the voyage, &c.  The boats reached *Freeport,* three miles above *New-Orleans,* on the 24th of *June,* 1846, and three days after landing, according to the usage of the flat-boat trade, all the hands but two were paid off and discharged.  *Freeport,* for convenience, and to save the expense incurred at the *New-Orleans* wharf, is in practice the *New-Orleans* hay market.  It is a separate municipality, three miles above *New-Orleans,* another intervening; and is not the place of landing hay, but only a place of exhibiting for the purpose of sale, the flat-boat wharf at *New-Orleans* being the place of landing and discharging the cargo.  On the evening of the third of *July,* 1846, both boats and their cargoes were destroyed by a storm.

*Held,* that *New-Orleans,* and not *Freeport,* was the *terminus* of the voyage.

May Term,
1854.

GRANT
v.
THE LEXING-
TON, &c., IN-
SURANCE CO.

*Held*, also, that the stop at *Freeport* was within the "coasting and transacting lawful business connected with the voyage," allowed by the policy.

*Held*, also, that evidence showing the usage as to discharging hands at *Freeport* was admissible; and that the insurers must be presumed to have known the usage, and to have contemplated it in the policy.

A policy of insurance of a flat-boat contained a stipulation on the part of the assured that the boat should be manned with a specified number of hands. *Held*, that the stipulation was what is termed an executory stipulation or promissory warranty.

An executory stipulation or promissory warranty, inserted in a policy of insurance, becomes a binding condition on the assured, and requires a strict performance; and the breach of it, whether the thing warranted is material or not, renders the policy void from its inception.

A policy of insurance required that flat-boats of prescribed dimensions should be manned with not less than a specified number of competent hands, &c. *Held*, that the cook was a competent hand, within the meaning of the policy.

A policy of insurance upon the cargo of a flat-boat, contained a stipulation that the insurer should not be liable for any loss or damage during any time in which the flat-boat might be lashed or fastened to any other boat, &c., nor in any case if towed by a steamboat, &c. *Held*, that the insurers were to be discharged only as to a loss accruing from such towing.

Monday,
May 22.

ERROR to the *Dearborn* Circuit Court.

STUART, J.—Assumpsit on a policy of insurance on two flat-boats loaded with hay, owned by *Grant* and *Walters*, and bound from *Lawrenceburgh* to *New-Orleans*. Each boat contained ninety-five tons. The hay was worth 2,550 dollars. The defendant insured the whole cargo on one boat, and fifty tons on the other. The amount insured is valued in the policy at 2,175 dollars; premium paid 108 dollars and 75 cents. The defence, consisting of the general issue, and a special plea of limitation leading to an issue of fact, raises no question on the pleadings for our consideration. The trial by jury resulted in a verdict and judgment in favor of the insurance company.

The risk taken was for the voyage to *New-Orleans* and eight days thereafter.

Among the conditions it was stipulated that the boats should be manned with a competent number of hands; and that it might be lawful for them to touch at intermediate points, with the privilege of coasting, and transacting any lawful business connected with the voyage, provided the delays caused thereby should not exceed thirty days in all.

May Term,
1854.

GRANT
v.
THE LEXING-
TON, &c., IN-
SURANCE CO.

There is a further stipulation in the policy in these words: " And it is hereby agreed that this insurance company is not liable for loss or damage arising from, or caused by, the said flat-boats being unduly laden, nor for loss or damage during any time in which the said flat-boats may be lashed or fastened to any other boat, either floating or landing therewith (except in the *Ohio* or *Mississippi* rivers), nor in any case if towed by a steamboat, or if more than two boats are lashed or fastened together."

These cover the only points material to be considered in the present case.

The evidence is made part of the record. It appears that the boats reached *Freeport*, three miles above *New-Orleans*, on the 24th of *June*, 1846. There, three days after landing, all the hands but two were paid off and discharged. About the 1st of *July*, 1846, one of the boats was towed down to the flat-boat landing at *New-Orleans* by a steamer; the other still lay at *Freeport*. The object of hay-boats stopping at *Freeport* was to give time to make sale. At the flat-boat wharf at *New-Orleans*, it appears, they can only lie four days and then are compelled to sell. On the evening of the 3d of *July*, 1846, a violent storm came on, which destroyed both boats. The witnesses all agree that a removal of the hay from the boats during the storm would have been unavailing, even had it been possible, for that the torrents of rain falling at the time would have been equally destructive to the cargo.

The witnesses also agree that by means of pumps, &c., great exertions were made to save the boats; but that such was the violence of the storm that all reasonable exertions were in a great measure fruitless.

One of the witnesses says, that after the landing at *Freeport*, the same number of hands is not necessary; that hay-boats stop there to avoid paying wharfage; that such articles as hay, purchasers living in *New-Orleans* expect to find and contract for at *Freeport*. Another witness says, with all articles like hay it is the usage and custom to land at *Freeport*, and there remain till sales are made, and then drop down to flat-boat landing at *New-Orleans*. The

May Term, 1854.

GRANT
v.
THE LEXING-
TON, &c., IN-
SURANCE CO.

witness adds: "Hands on flat-boats have a right· at the end of three days after the flat-boat lands at any point in *Louisiana*, and remains at any one place that length of time, to demand their pay and leave the boat." This seems to ·be the usual course of that trade on the river.

This cause was submitted here in *December*, 1851. In the only brief we could find among the papers, there are but two or three authorities cited, and these to a point of minor importance. It is, therefore, to be presumed, that in a cause of such intricacy and magnitude, elaborate briefs were filed, and that in the confusion incident to the coming in of the new Court, they have been mislaid. Such misfortunes throw upon us great additional labor, and consequently delay the business of the Court.

The grounds assumed by the insurance company against the recovery of *Grant* and *Walters*, as we gather them from the records, are,

1. That the landing at *Freeport* was, within the meaning of the policy, the town, city, or market-place of destination, and that eight days after reaching such market-place, the risk terminated.

2. If the risk still continued at *Freeport*, was the discharge of the hands in contravention of the terms of the policy?

3. Were the boats from the beginning manned with a competent number of hands?

4. Was the towing of the boat from *Freeport* to *New-Orleans* by a steamer, a discharge of the insurers?

There are several other questions suggested by the evidence and instructions which need not be noticed. For example, the issue formed on the delay to bring suit (1). But the record clearly shows that the delay is a result to which the insurance company mainly contributed by holding out hopes of an amicable adjustment. She should not, therefore, be permitted to take advantage of her own wrong.

Another preliminary consideration of vital moment is the rule of construction to be adopted in such cases. In *Yeaton* v. *Fry*, 5 Cranch 335, it is said, that policies of

insurance are generally the most informal instruments brought before the Courts; and that none are more liberally construed to carry out the real intention of the parties, if that intention can be discovered. But Judge *Duer*, writing long after this decision, and no doubt fully aware of it, seems to hold to a different rule. Insurance policies are to be liberally construed in favor of the assured; and an exception is to be strictly construed against the underwriters. 1 Duer on Ins. 161. The facts in the case in *Cranch, supra,* fully illustrate the strictness of the rule of construction as to exceptions.

First, then, as to the termination of the voyage at *Freeport*. The risk was taken from *Lawrenceburgh* to *New-Orleans*, and eight days thereafter, with privilege of thirty days coasting, &c. It has been seen from the evidence that *Freeport* is made in practice the *New-Orleans* hay market. This is for the convenience of all the parties, and to save the expense incurred at the *New-Orleans* wharf. The evidence shows that *Freeport* is a separate municipality, three miles above *New-Orleans*. *Lafayette*, also a separate municipality, intervenes. Nor does *Freeport* appear to be the place of landing hay, but only a place of exhibiting for the purpose of sale. The flat-boat wharf at *New-Orleans* is the place of landing and discharging the cargo. The latter is, therefore, the termination of the voyage. *Freeport* is no more *New-Orleans*, within the express terms of the policy, than *Memphis*, or any other town on the river. The stop at *Freeport* is clearly the "coasting and transacting lawful business connected with the voyage," which the underwriters have expressly provided for and licensed. It is not contended that the delay caused thereby exceeded thirty days. And as will appear in the sequel, it is presumed that the underwriters were acquainted with this usage of the trade to which their policy related. *Grant* v. *Paxton*, 1 Taunt. 463.—*Noble* v. *Kennoway*, 2 Douglass 510. There is, therefore, nothing in the first objection.

2. If the risk still continued at *Freeport*, was the dis-

May Term,
1854.

GRANT
v.
THE LEXING-
TON, &c., IN-
SURANCE Co.

May Term, 1854.

GRANT
v.
THE LEXING-
TON, &c., IN-
SURANCE CO.

charge of the hands in contravention of the terms of the policy?

Some evidence was given to show that such was the usage of the trade. The plaintiff offered to give further evidence on that point, but, upon objection being made, the Court refused to admit it. This ruling, and the evidence to the same effect, which was received without objection, as well as some instructions asked by the defendant and given by the Court, present the question just stated. The law is well settled both against the ruling and the instructions. In *Noble* v. *Kennoway*, Lord *Mansfield* held, that the underwriter is bound to know the nature and peculiar circumstances of the branch of trade to which the policy relates. The insurance to which he referred was on cargoes of two ships, the *Hope* and the *Ann*, in the *Labrador* and *New-Foundland* trade. The one arrived safe on the 22d of *June*, 1778, and the other on the 14th of *July* following. The crews of these vessels were immediately employed in fishing. On the 13th of *August* following, an *American* privateer took both vessels, finding no one at the time on board. The action was brought to recover the value of the goods. The underwriters set up in defence that there had been unnecessary delay in unloading the cargoes. The plaintiffs rested their case on the terms of the policy and the usage of trade. "If," says the Court, "the underwriters do not know the usage, they ought to inform themselves. It is no matter if the usage has only been for a short period. But this trade has existed for several years. It is well known that fishing is the chief object of the voyage. The evidence as to the usage was properly admitted." 2 Douglass R. 510. Accordingly, *Grant* v. *Paxton*, 1 Taunt. 463.—*Moxon* v. *Atkins*, 3 Campbell 200.—*Salvador* v. *Hopkins*, 3 Burr. 1707.—*Buck* v. *The Chesapeake Insurance Company*, 1 Pet. 151.—*Hazard's Adm'r.* v. *N. E. Marine Insurance Company*, 8 Pet. 537.—3 Wend. 283.—7 Johns. R. 385.— 3 Hill 250.

On the strength of these authorities, the evidence as to the usage of discharging the hands at *Freeport* should,

May Term,
1854.

GRANT
v.
THE LEXING-
TON, &c., IN-
SURANCE CO.

therefore, have been admitted. The case in *Douglass* is much stronger than the case at bar. The merchandise was insured till safely landed. It had lain on board four or five weeks. In consequence of that delay it was captured by the privateer. In the case at bar, the evidence shows that the risk was not affected by the discharge of the hands—that no reasonable exertions of a full and competent crew could have saved the hay. There is nothing in the second objection.

3. Were the boats, at the inception and during the voyage, manned with a competent number of hands?

The evidence conduces to prove that the one boat was eighty feet long; the other ninety or ninety-five feet long. The policy expressly requires that boats from seventy to ninety feet should have not less than four competent hands and a pilot; and boats from ninety to ninety-five feet, five competent hands and a pilot. The two boats, lashed together on the voyage, had eight hands, two pilots, and a cook. The question is, was this a competent number of hands, within the terms of the policy?

This was what the books call an executory stipulation, or promissory warranty, inserted in the policy, and which became a binding condition on the insured, and required strict performance. The breach of it, whether the thing warranted was material or not, renders the policy void from its inception. *Bond* v. *Nutt*, Cowp. 601.—*De Hahn* v. *Hartley*, 1 T. R. 343.—*Hore* v. *Whitmore*, Cowp. 784.—*Pawson* v. *Watson*, *id*. 785. In *Goix* v. *Low*, 1 Johns. Cases 341, and *Barker* v. *The Phœnix Insurance Company*, 8 Johns. R. 307, the vessels were respectively called "*American*" in the policy; and this was held a warranty that they were *American* property, the proof of which was essential to a right to recover. So also, as to warranty, 6 Wend. 494.—15 *id*. 532.

If, therefore, there were not the requisite number of hands, according to the executory conditions of the policy, the assured has no right of action. It is objected that the cook was not a competent hand. But this case is clearly within the rule in *Bean* v. *Stupart*, 1 Douglass 11. There

May Term, 1854.

GRANT
v.
THE LEXING-
TON, &c., IN-
SURANCE CO.

the express stipulation was, "thirty seamen besides passengers;" the defence set up, that there were not thirty seamen on board. To make up that number it was necessary the steward, cook, surgeon, and some boys learning to be seamen, should be counted. But only twenty-six persons signed the ship's articles. It was urged that the difference between seamen and boys was as well understood as that between clergymen and laymen; that seaman meant an able-bodied man, trained to maritime pursuits. But the Court, Lord *Mansfield*, held the terms of the policy substantially complied with. If the cook was a seaman in *Mansfield's* time, he can not be much less than a competent flat-boat hand in our day. The large boat had a force of five hands and a pilot, and the small boat four hands and a pilot, which was a substantial compliance with the executory stipulation of the policy, and the dimensions of the boats as disclosed in evidence (2).

4. Did the towing of the hay-boat from *Freeport* to *New-Orleans* by a steamer, operate to discharge the underwriters?

If so, it could only be as to the boat thus towed in contravention of the policy. And whether as to that even must depend on the terms used. By reference to that particular clause above quoted, it appears that the insurance company was to be discharged only as to any loss accruing from such towing by a steamer. The loss in this case did not accrue from that cause. It was a common calamity, involving the destruction alike of the boat that had been so towed and that lying at *Freeport*, and resulted from one of the perils insured against.

We are clearly of opinion that upon the whole case made the insurance company is liable. The new trial should have been granted. The instructions of the Court upon the several points alluded to were erroneous, and well calculated to mislead the jury.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded, &c.

*D. Macy* and *S. H. Spooner*, for the plaintiffs.

*P. L. Spooner* and *B. J. Spooner*, for the defendants.

May Term,
1854.

(1) The stipulation in the policy was as follows: "All claims under this policy are debarred unless prosecuted within one year from the date of the loss."

(2) In *Dixon* v. *Sadler*, 5 Mees. and Welsby 414, *Parke*, J., (one of the most eminent authorities on matters of insurance) held, that if a voyage be such as to require a different complement of men, or a different state of equipment, in the several stages of the voyage, as if it were a voyage down a canal or river and thence across to the open sea, it would suffice if the vessel were properly manned and equipped for each stage of the navigation as it occurred.