## Case No. 18,095.

WRIGHT v. SUN MUT. INS. CO.

SAME v. ORIENT MUT. INS. CO.

[6 Am. Law Reg. 485.]

Circuit Court, D. Maryland. April 21, 1858.[1]

MARINE INSURANCE — FOREIGN COMPANY — LOCUS CONTRACTUS—ADDITIONAL PREMIUM.

1. Where an insurance company incorporated by the state of New York, having their principal office in New York, and there executing policies of insurance which were transmitted to agents in Baltimore, who had authority to receive applications for policies, and to receive and transmit notes for the premiums, and through whom the company paid losses to parties in Baltimore, underwrote a policy, and sent it to parties residing at Baltimore, it was *held* that the contract of insurance was a New York, and not a Maryland, contract.

2. Where the policy contained this clause, "to add an additional premium if by vessels rating lower than A2," and the cargo was shipped in a schooner rating lower than A2, and no fixed sum as additional premium agreed upon, *held* that the assured, in case of loss, could recover the value agreed in the policy, less such additional premium beyond the agreed per cent. as in the opinion of the underwriters might be deemed adequate for the increased risk of a cargo shipped in a vessel rating below A2.

[These were actions by John S. Wright against the Sun Mutual Insurance Company of New York and the Orient Mutual Insurance Company of New York, respectively.]

Henry May, Robert J. Brent, and Vivian Brent, for plaintiff.

John Nelson, Brown & Brune, F. B. Cutting, and Alexander Hamilton, Jr., for defendants.

The suits were begun by attachment, issued in the superior court for the city of Baltimore, and were removed into the circuit court of the United States for this district, under the act of congress. The two cases were tried together, and were commenced on Thursday, 16th April, and terminated on Wednesday, the 21st April, by a verdict in each case for the plaintiff for the sum of $17,365 13—under the direction and instruction of the court.

[1] [Reversed in 23 How. (64 U. S.) 401, 412.]

The opinion of the court (GILES, District Judge), which was not in writing, embraced the following points: The judge remarked in the commencement of his opinion, that the principal point in these cases was one deeply interesting to the commercial community, among whom these running policies were so frequently used. The defendants were insurance companies incorporated by the state of New York, and their offices were located in the city of New York. They had agents residing in this city, who received and forwarded them all applications for insurance; and received and transmitted to them the notes given for the premiums from time to time, and through whom the said defendants made payments for losses on policies held by parties residing here. The policies on which these attachments were issued, had been executed by the defendants in the city of New York, and transmitted to their agents in this city, by whom they were delivered to the plaintiff. The plaintiff, in both cases, had given to the said agents his promissory notes for the premium mentioned in said policies, and in the case of the Sun Mutual Ins. Co. the notes had been paid by plaintiff; and in the case of the Orient Mutual Ins. Co. the money had been placed by him in the Union Bank of this city, (where said notes were payable,) to meet them, but that company had so far, declined to receive it. The first question in these cases is, are these policies of insurance to be considered as contracts made in the city of New York, or as made in the city of Baltimore? For, when you have ascertained at which place the contract is to be considered as made, it is to be construed and interpreted by the law and the usages of that place, except where a contract is made in one place, and, by its terms, it is positively to be performed in another. The learned counsel for the plaintiff has contended that these policies were to be considered as Maryland contracts, and to be construed in reference to the usages and customs of underwriters in this city. Now this became an important question in the cases, because on the books of the insurance companies in New York, the schooner Mary W. (whose loss had given rise to this controversy) was rated below A2, while on the books of underwriters and mercantile records in this city she was rated A2. The authorities referred to by plaintiff's counsel did not, in the opinion of the court, sustain the position he sought to maintain. In the case of Bank of Augusta v. Earles, 13 Pet. [38 U. S.] 519, the principal point decided was, that a bank chartered in Georgia could purchase a bill of exchange in Mobile.

In the case of Cox v. U. S., 6 Pet. [31 U. S.] 172, the point decided was, that the official bond of the navy agent, although signed at New Orleans, was for his faithfully accounting at the proper department at Washington, and that therefore the liabilities of the sureties were to be governed by the principles of

the common law, and not by the civil law of Louisiana. The case of Boyle v. Zacharie, Id. 635, was one of a payment made in Louisiana by plaintiffs for Boyle, and by his sanction, to release his property there attached, and created a debt due there, and was not released by the subsequent discharge of Boyle under the insolvent laws of Maryland.

In the case of Hazard's Adm'rs v. New England Marine Ins. Co., 8 Pet. [33 U. S.] 557, the point decided was that the letter, on application for insurance, written in New York, where Hazard resided, although addressed to the defendants, a company incorporated in Massachusetts, and having their office in Boston, was to be tested as to the truth of its representations by the custom as to the extent of coppering vessels in New York and not by the custom in Boston. Judge Story in his great work on "The Conflict of Laws" (section 278) says: "A policy of insurance executed in England on a French ship for the French owner, on a voyage from one French port to another, would be treated as an English contract, and in case of loss, the debt would be treated as an English debt." So in section 289, the same learned author says: "A merchant, resident in Ireland, sends to England certain bills of exchange, with blanks for the dates, the sums, the times of payment and the names of the drawees. These bills are signed by the merchant in Ireland, endorsed with his own name, and dated from a place in Ireland, and are transmitted to a correspondent in England, with authority to him to fill up the remaining parts of the instrument. The correspondent in England accordingly fills them up, dated at a place in Ireland. Are the bills, when thus filled up and issued, to be deemed English or Irish contracts? It has been held, that under such circumstances, they are to be deemed Irish contracts, and of course to be governed as to stamps and other legal requisitions by the law of Ireland;" and analogous principles have been recognized in the following cases: Woolsey v. Bailey, 7 Fost. (N. H.) 217; Smith v. Smith, Id. 244; Davis v. Coleman, 11 Ired. 303. But this very question has been settled in two cases by the court of appeals of New York; and in one by the superior court in the same state, in the cases of Hyde v. Goodnow, 3 Comst. [3 N. Y.] 264; Western v. Genesee Mut. Ins. Co., 2 Kernan [12 N. Y.] 258; and St. John v. American Mut. Life Ins. Co., 2 Duer, 419. In this last case the policy was issued from the office of an agency of the company in New York, although the company was incorporated in Connecticut; and it was held that the construction and effect of this policy were to be governed by the law of Connecticut.

The case of Hyde v. Goodnow was an action to recover the amount of two premium notes given on a policy of insurance. A mutual insurance company of New York had an

agent residing in Ohio, authorized to receive applications for insurance. This agent received from a party residing in Ohio, the application with the premium notes, and transmitted them to the office of the company in New York, where they were received and approved, and where the policy was executed and transmitted to the applicant by mail. It was held by the court that the contract was made in New York at the office of the company, and not in Ohio.

In the case of Western v. Genesee Mut. Ins. Co.—a mutual insurance company incorporated and located in New York—had an agent residing in Canada, who received the application for insurance, and sent it to the company in New York, who there signed the policy of insurance and forwarded it to their agent to be delivered to the applicant—it was held to be a New York contract, and its validity to depend upon the laws of that state. The judge therefore held upon principle and upon authority that the policies of insurance in these cases now being tried, were to be considered New York contracts, and to be construed and interpreted as such, for by section 263 of "The Conflict of Laws," the rule is laid down, "that the law of the place of the contract is to govern, as to the nature, the obligation and the interpretation of the contract." In this case, therefore, as the evidence showed that the schooner Mary W. was rated below A2, in New York, what is the true construction of these policies, in that view, and assuming that fact to be proved? These policies, although differing slightly in phraseology, are substantially the same, and the court treated of them together. Now, what are the principal provisions of the "Sun" policy? "The Sun Mutual Insurance Company do make insurance, and cause Jno. S. Wright to be insured, lost or not lost, at and from Rio de Janeiro to a port in the United States, one half of 5,000 bags of coffee, laden, or to be laden, on board the good vessel or vessels, &c. Beginning the adventure upon the said goods from and immediately following the loading thereof on board the said vessel, and shall so continue and endure until the goods shall be safely landed at ———, aforesaid. The said goods hereby insured; are valued at $18 *per bag, as interest may appear*," and the policy admits "that the company have been paid for this insurance by the assured, at and after the rate of *one and one-half per cent.: To return one quarter of one per cent. if direct to an Atlantic port. To add an additional premium if by vessels rating lower than A2, or by foreign vessels;* subject to such addition or deduction as shall make the premiums conform to the established rate at the time the return is made to the company." The words italicised are in writing, and not printed, as are the other provisions of the policy.

The other clauses of the policy are not

material to this inquiry. On the back of this policy there was this endorsement, made by the defendant's agent in this city:—"1856, August 27. Schooner 'Mary W.,' Rio de Janeiro to New Orleans, on half cargo, 1,830 bags coffee, valued at $18 per bag, not to attach if vessel be proved unseaworthy."—$16,-470. Now, the counsel for the defendants contended that this coffee never was covered by the said policy, because it was loaded on board a vessel rating below A2, and the correspondence showed that no additional premium had been agreed upon between the parties, and that, by the true construction of the policy, the defendants had the right to fix the additional premium. Now, what are the rules for the construction of policies of insurance, as recognized and acted upon by courts of justice? The first one is common to the construction of all contracts; that you must from the written paper, ascertain, if possible, what was the true meaning and understanding of the parties in the language they have used, and to carry that into effect, if it violates no principle of law. The second rule is, that policies of insurance are always to be construed liberally, so as to insure the indemnity sought for, and that if there be any ambiguity in the words of an exception, they are to be construed most strongly against the party for whose benefit they are introduced. Another rule is, where the written and printed clauses of a policy are in conflict, the written ones are to be sustained and carried into effect. For these rules the court referred to the cases of Palmer v. Warren Ins. Co. [Case No. 10,698]; Yeaton v. Frey, 5 Cranch [9 U. S.] 335; Grant v. Lexington Ins. Co., 5 Ind. 23; Mobile Marine Dock & Ins. Co. v. McMillan, 27 Ala. 77; Sayles v. Northwestern Ins. Co. [Case No. 12,422]; and Breasted v. Farmers' Loan & Trust Co., 2 Seld. [6 N. Y.] 299. This last case was peculiar. It was decided by the court of appeals of New York, that in a life policy insurance, a provision "that it should be void if the assured should die by his own hand" had reference to an act of criminal self-destruction, and not to one committed "while the party was insane." By these rules let this policy be construed. And can it be successfully contended for one moment, that when the assured procured this policy, he had no intention of covering any of his coffee that might be sent to him in vessels rating below A2, until he and the company should agree upon the additional premium to be charged in such cases? What were the reasons for his procuring this policy, and paying the premium on so large amount in advance? Because he did not know at what time and by what vessels his correspondents in Rio might send him the 5,000 bags of coffee he had directed them to purchase on his account, and he therefore wished his property to be thus covered by insurance whenever it was afloat on the ocean, for it might well be, that he might never hear of

the shipment of his coffee until its safe arrival or loss. This necessity of the mercantile world has given rise to these running policies, which cover annually property to the value of millions of dollars. But if the view of these insurance companies is to prevail, that the property is not covered until the additional premium is fixed by them, or agreed upon between the parties, then a very speedy termination would be put to this kind of policy, and the defendants might as well close their agencies in this city. But such the court held not to be the true construction of this policy. The policy meant this, and nothing more: that the defendants would insure the coffee of plaintiff, in its transit from Rio to a port in the United States, at 1½ per cent. premium by whatever vessel carried, but if carried in a vessel rating below A2, or by a foreign vessel, an additional premium should be paid them. Additional to what? Why, to the 1½ per cent. already paid, and such additional premium as, in the opinion of underwriters, would be equal to the increased risk to such a cargo in vessels rating below A2, or in foreign vessels. And this seems to have been the view taken by the Sun Mutual Insurance Company itself in its correspondence with its agent in this city; for although, in their letter of August 25th, 1856, they take the ground "that the assured had no right to have this risk on the Mary W. covered on this policy," they subsequently recede from this position, and in their letter of the 30th August, "they admit he had the right, but that the fixing of the premium rested solely with them." The court thought the latter position as untenable as the former. As something had been said in the course of the argument, in reference to the endorsement on the policy of the 27th August, the court remarked that they considered this endorsement fully warranted by the defendants' letter to their agent, of that date; and that, indeed, the agent, with that letter in his hand, could have made no other endorsement. The plaintiff presented the two prayers, and the defendants presented three prayers. The court remarked that they agreed with the propositions of law contained in defendants' first and second prayers, and plaintiff's second prayer, and only rejected them because they were substantially embraced in the instruction which the court would give to the jury, but they rejected the plaintiff's first prayer and the defendants' third prayer as in conflict with their view of the law of the case; and the court then gave to the jury the following instruction: "If the jury shall find from the evidence, that the defendants executed the policy of the 27th July, 1855, and received from the plaintiff the premium therein mentioned; and that their duly authorized agent in this city made the endorsements on the said policy, which have been offered in evidence, and shall further find that 1,830 bags of coffee, belonging

to plaintiff, were shipped on the 12th of July, 1856, at Rio, on board the schooner Mary W., to be carried to New Orleans, and that when said schooner left Rio she was seaworthy and in good condition; and shall further find, that the said vessel and cargo were subsequently on said voyage totally lost by one of the perils insured against; and that said schooner was rated lower in New York than A2, then the plaintiff is entitled to recover for one half the value of said coffee so lost, at $18 per bag, less such additional premium beyond the 1½ per cent., as in the opinion of the underwriters may be deemed adequate for the increased risk to a cargo of coffee shipped in a vessel rating below A2, with interest from thirty days after such time as the jury may find the defendants were furnished by plaintiff with the preliminary proofs of his said loss; and there is no evidence in this case that the said schooner at any period during the running of this policy rated as high as A2 in any of the insurance offices in New York."

[The judgments in these two cases were afterwards reversed by the supreme court. See 23 How. (64 U. S.) 412.]