# MOBILE MARINE DOCK & MUTUAL INSURANCE CO. *vs.* McMILLAN & SON.

[ACTION (UNDER CODE) ON MARINE POLICY OF INSURANCE.]

1. *Custom affects policy.*—Every usage of trade which is so well settled, or so generally known, that all persons engaged in that trade may fairly be considered as contracting with reference to it, is regarded as forming part of every policy designed to protect risks in that trade, unless by the express terms of the policy, or by necessary implication, such inference is repelled.

2. *General rules for construction of policies.*—The same rules of construction by which the sense and meaning of all other instruments are determined, apply equally to policies of insurance ; yet policies are to be construed liberally for the benefit of the assured, and if any doubt should arise upon the meaning of the whole instrument, greater effect should be allowed to the written than to the printed words.

3. *Difference between contracts of insurer and carrier.*—The contract of the insurer is not necessarily co-extensive with that of the carrier by whom the goods are transported, and it is therefore erroneous to hold him liable until the goods are delivered to the consignee, or to some one for him, or are landed at the place where it is usual for him to receive goods. The carrier, by the terms of his contract, or by force of a custom, may be liable for the over-land transportation of the goods, after they shall have been landed at the accustomed port of destination, to the place where the consignee usually receives goods, or until delivered to him ; while the risk of a marine policy is at end, in the absence of express stipulations to the contrary, whenever the goods can be considered safely landed according to the usual course of business, at the accustomed port of destination, although they may never have been delivered to the consignee.

4. *Port of New Orleans, in marine policy, means usual place of landing goods on wharf at Lake Pontchartrain.*—A marine policy was effected on a lot of cotton, shipped from Mobile to New Orleans, on board of a vessel which did not go

to the city of New Orleans, but always discharged her cargo at the wharf on Lake Pontchartrain ; and the stipulation of the policy was, that the risk should continue "until the said goods shall be safely landed at the port of New Orleans" : *Held*, that the risk terminated with the safe landing of the goods at the wharf on Lake Pontchartrain.

5. Error without injury will not reverse a judgment.

6. *Policy held a severable contract.*—A policy of insurance upon 198 bales of cotton, valued at $9,900, at a premium of three-sixteenths, is so far a severable contract, that the underwriters are discharged from liability for whatever portion is safely landed at the port of destination,

APPEAL from the City Court of Mobile.

Tried before the Hon. ALEX. McKINSTRY.

THIS was an action (under the Code) on a policy of insurance on 198 bales of cotton, shipped from Mobile to New Orleans, on board of the Helen ; and the only plea was, the general issue, with leave to give any special matter in evidence. The amount insured, endorsed in gross, was $9,900 ; the rate three-sixteenths of one per cent.; and the stipulation as to the beginning and duration of the risk, as " Beginning the adventure upon the said goods and merchandise from and immediately following the loading thereof on board the vessel called the Helen, at the port of Mobile, and so shall continue and endure until the said goods and merchandise shall be safely landed at the port of New Orleans."

The facts proved on the trial, as stated in the defendant's bill of exceptions, were as follows :—

" The plaintiffs proved the contract of insurance with the defendant upon 198 bales of cotton, valued at $50 per bale, and shipped from Mobile on the steamer Helen. They also proved that said cotton was laden on board the Helen, from the wharf in the city of Mobile, on the — day of January, 1854, and was consigned by bill of lading to Rugely; Blair & Co., who did business in the city of New Orleans ; that said steamer arrived at the wharf belonging to the Carrollton and Jefferson railroad company, on the southern shore of Lake Pontchartrain, and distant about eight miles from the depot of said railroad in the city of New Orleans, on the evening of the 28th January, 1854, about 8 o'clock, P. M., and immediately began to unload her cargo on said wharf ; that while so unlading, but before all her cargo (which con-

sisted of about five hundred bales) had been landed—to-wit, about one-third of it—on said wharf, the steamer Georgia made fast to the same wharf at about 11, P. M.; that a fire broke out on the Georgia, which extended to the wharf, and consumed the Georgia, the wharf, and all the goods thereon; that at the time of the fire, about 134 bales of plaintiffs' cotton had been put off from the Helen, and were there consumed, and only 64 bales (out of the whole shipment of 198 bales) came to the possession of said consignees in New Orleans, which said 64 bales were received by the consignees without objection. It was agreed that the value of said 134 bales, under the policy, was $6,700.

"There was evidence tending to show that it is the custom of steamboats, in the trade between Mobile and New Orleans, to contract to deliver their cargoes in the city of New Orleans, and that the railroad to the city, in the transportation to the city, acts as the agent of the boat; that the boat collects the freight for the whole trip, and pays to the railroad its proportion of the freight; that goods shipped at Mobile, on any of the lines to New Orleans, are deliverable in the city of New Orleans, at the depot of the railroad, by the terms of the ordinary bill of lading." (A copy of such bill of lading, showing this fact, is here attached as an exhibit to the bill of exceptions.)

"On the part of the defendant, it was proved that the Helen was a regular packet, running between Mobile and New Orleans; that she uniformly landed her cargo on the southern shore of Lake Pontchartrain, on the wharf at the lake end of the Carrollton and Jefferson railroad, and there took on board her cargo for Mobile; that this was her regular and uniform place of discharge, and of taking her cargo on board, well known to all in the habit of shipping goods by her; and that plaintiffs were in the habit of shipping goods by her. It was proved, also, that the steamboats engaged in said trade had each their regular places of landing on Lake Pontchartrain, and did not approach nearer to the city of New Orleans than the south side of Lake Pontchartrain, where they uniformly laded and unladed their cargoes; that there is a canal connecting the city with the lake, but it is not used by these steamers; that goods may also be carried

to the city by way of the Mississippi river, and landed on the levee, but such voyage is unusual, and would subject the shipper to a larger premium for insurance than by way of the lake. There was evidence, also, tending to show that, in mercantile understanding, the port of New Orleans embraces the wharves of the railroad on the lake, as well as the levee on the Mississippi river; but as to this, there was also proof. that the landing at the lake is in a different parish from that of New Orleans, and a distinct port of entry.

It was in proof, also, that it was usual and customary for steamboats in this trade to unload their cargoes on the railroad wharf, immediately on their arrival, whether by day or night—if in the night, the cargo is received on the next morning, and forwarded by the first cars; if by day, the same is received and forwarded by the first cars which leave for the city, and is *then* (?) delivered to the consignee named in the bill of lading; that when goods are landed upon the wharf, the officers and crew of the boat usually exercise no further control over the goods, and they are taken charge of by the officers and servants of the railroad company, who transport them to the city in fulfillment of the contract of the boat with the shipper; that no notice is given to the consignee of the arrival of the boat at the wharf, (he residing in the city of New Orleans,) nor is any notice of such arrival at the wharf given to any one, nor was any notice given to any one in this instance; that the boat unlades her cargo at the wharf, and the agents of the railroad company there receive it, and forward it to the city, as above stated; that the boat in this case proceeded with her unlading as was usual and customary; that a watchman, employed by the railroad company to keep watch over the wharf and goods thereon, was on the wharf at the time of the arrival of the Helen and the unlading of her cargo, but there was no proof that he interfered, or had any authority to interfere, with the landing of the cotton from the boat, or to take charge of it when landed—he was a mere sentinel; that one hundred and thirty-four bales of the plaintiffs' cotton had been landed from the boat, on the wharf, at the time of the fire, and such landing had been in all things as usual and customary with the Helen, and nothing more remained to be done by her crew and officers about the

landing of said 134 bales, but the obligation of the boat continued to transport said cotton to the city of New Orleans.

"Two instances were shown to have occurred in Mobile, previous to this shipment, wherein a larger premium had been demanded by insurers, and paid by assured, to cover the risk of goods while on the voyage, as well as on the railroad after they had been unladed from the boat, than was the usual rate demanded and paid as premiums for the ordinary contract of insurance on goods 'till safely landed at the port of New Orleans.' No other instances were shown, prior to this fire, where the question had been considered ; and no cases were proven, prior to this fire, of losses that had happened after the goods had been unladen from the boat, or on the railroad between the lake and the city, having been either paid or refused. There was no proof that any loss had occurred prior to the fire proved in this case. The two cases referred to were stated by the witnesses to have occurred in this wise : The parties wishing insurance applied to the underwriters, stating that they wished to cover the cotton till in warehouse, or until on shipboard there (which was not recollected) ; the risk was taken, and policies executed, of which a copy is hereto annexed as an exhibit ; and it was proved, also, that the assured in these two cases took a further policy in New Orleans, covering the thing insured from New Orleans till laden on shipboard in the Mississippi river.

"The court charged the jury, that whether the policy in this case extended to New Orleans, or only to the terminus of the boat's voyage at Lake Pontchartrain, the liability of the insurer continued until the goods were safely landed ; that if they were burned before they were landed, the plaintiff was entitled to recover ; that as to the phrase 'until safely landed', they must look to the custom, if any had been proved ; that, to discharge the underwriters, there must be either an actual or a constructive delivery of the goods ; that the liability of the insurer continued till the goods were safely delivered to the consignee, or some one for him ; that an actual delivery was established when the cotton was safely landed on the wharf, or the usual place of delivery, and received by the consignee, or by some one there authorized to receive it for him, or where any one authorized to

receive took charge or control of the cotton as it was put off from the boat; that the putting off from the boat of any number of bales on the wharf, unless some one in behalf of the consignee took charge of the cotton, was not sufficient to discharge the underwriter; that if the cotton was landed at the usual time, in the usual manner, and at the usual place, and the consignee (or some one authorized to receive the cotton for him) had a reasonable time to take control of it,— that would be a constructive delivery; that the custom which would govern the case must be a reasonable mode of delivery, and it was not sufficient for the boat simply to have the cotton put on the wharf after eight o'clock in the night, without notice to the consignee, or some one for him, and without delivery to him, or to some one for him; that if they found the unlading of the cotton was begun as late as 8 o'clock at night, and while the unlading was in progress, and before the 198 bales had been put off from the boat, it was burned, and there was no person there authorized to receive it for the consignee, and no person authorized to take charge of it had been notified of its arrival,—then the putting off of the 134 bales would not be a compliance with the policy, and plaintiff must recover.

"To this charge the defendant excepted, and then requested the court to charge as follows:—

"1. That the defendant is not liable to make good any loss that may have occurred to the cargo of the Helen after the same had been safely landed from the boat; which charge the court refused, and the defendant excepted.

"2. That if the cotton in question was landed at the usual wharf of the Helen, and in the usual manner, and was thereafter destroyed by fire, the jury must find for the defendant; which charge was refused, and the defendant excepted.

"3. That if the jury believe the 134 bales sued for were landed from the Helen at her usual place of discharge, and in the usual manner, and were subsequently burned on the wharf, plaintiffs cannot recover; and this, though the whole shipment consisted of 198 bales, of which sixty-four still remained on board the boat; which charge the court refused, and the defendant excepted.

"4. That if the plaintiff, by himself or agent, received and

accepted from the Helen sixty-four bales, part of this ship-ment, he is not entitled now to object that only 134 bales (and not the 198) had been landed on the wharf; which charge the court refused, and the defendant excepted.

"Defendant also requested the court to charge—

"5. That the defendant is not liable as general insurer against injury to the cotton on its transportation from Mobile to the city of New Orleans.

"6. That the liability of the defendant does not extend to inland risks, or risks on the railroad, beyond the wharf at Lake Pontchartrain.

"7. That to discharge the defendant, it is not necessary that the goods should be actually delivered to the consignee named in the bill of lading—it is sufficient that the goods be landed from the boat, at the usual place of unlading her cargo, and in the mode and manner customary in the trade.

"Which charges (Nos. 5, 6, and 7), as asked by defendant, were refused, but were given by the court as asked in con-nection with the following charge—to-wit: However true it may be that, when we speak of New Orleans, we mean the city which bears that name, it does not follow that the same meaning is attached to the word when used in a policy. The insurance is at and from the port of Mobile to the port of New Orleans; the term New Orleans means the port of New Orleans, the place which is the ultimate destination of the vessel on which the goods are laden. The voyage is under-stood to be terminated, when the vessel arrives at her port of destination, and has been moored there in safety twenty-four hours. The termination of the voyage as to the vessel does not necessarily terminate the risk on the goods: this risk may continue when the voyage as to the ship is ended; its duration depends on the intention of the parties, and this intention must be found in their contract. The words of the policy being, 'Beginning the adventure on the said goods and merchandise from and immediately following the lading thereof on board of said vessel at Mobile, and so shall con-tinue and endure until the said goods and merchandise shall be safely landed at the port of New Orleans,'—the risk con-tinues until the goods are safely landed, although the voyage as to the vessel might be terminated previous to their land-

ing ; and this risk continues until the goods are safely landed at the usual place, and at the disposal of the consignee. If it was usual to receive goods at the wharf on Lake Pontchartrain, or wherever it is usual for the consignee to receive his goods, it would be the duty of the consignee to receive them there, and a landing at such place would be a landing at the port of New Orleans ; but the risk of the insurer is not discharged until the goods are landed at the place where it is usual for the consignee to receive and take charge of his goods. To this charge as given, and to the refusal to charge as asked, the defendant also excepted."

The charges given, and the refusals to give the several charges asked, are now assigned for error.

P. HAMILTON, for the appellants :

The case presents two leading questions for solution :

1st. Does the risk assumed by the assurer extend to the city of New Orleans, or does it terminate at the terminus of the voyage of the boat ?

2d. Was there a safe landing of the 134 bales, so as to discharge the liability of the underwriter, or does the term " *until safely landed*" mean till safely delivered to the consignee ?

The ruling of the court, in substance, was that the liability of the underwriter continued till the goods reached the city of New Orleans-- that is, that it was co-extensive with the responsibility of the carrier ; and that whether that were so or not, still, to be safely landed, the goods must be safely delivered to the consignee, or some one for him, at the place where it was usual for the consignee to receive his goods. The evidence was, that the goods are, by the *terms of the contract with the boat*, deliverable to the consignee at the depot in the city ; so that in truth the court below decided one single question, to-wit : That the contract of assurance in this case covered the goods till they were landed in the city, at the place where it was usual for the consignee to take charge of them ; and being destroyed by a risk within the policy before they reached that point, the plaintiffs were entitled to recover. These decisions, which run through the whole charge of the court, and exhibit themselves in the refusals to

charge as requested by the defendant, are objected to as erroneous.

1st. As to the extent of the risk assumed by the defendant: The policy is a *marine policy:* the risk assumed is the risk named, on goods described, while on a certain vessel named, and on a certain voyage also described. It falls within the very definition of a contract of marine insurance.—1 Phil. Ins. 1 ; 1 Duer's Ins. 58. The policy describes the risks as " of the seas," &c., being on 198 bales of cotton from the port of Mobile to the port of New Orleans, on the steamer Helen, " *beginning the adventure upon the said goods and merchandise from and immediately following the loading thereof, on board of the said vessel* (*the Helen*) *at the port of Mobile, and so shall continue and endure until the said goods and merchandise shall be safely landed at the port of New Orleans,*" and is the same form of contract to be found in all the books on Marine Insurance, as belonging to that policy in all commercial countries. 1 Arnould Ins. p. 20. The contract is attached to the goods while *in transitu* on the voyage described, and in the vessel described ; it covered the goods during the voyage of the Helen : when that voyage was safely terminated, the contract of insurance was terminated. Both parties to the contract are chargeable with knowledge of the course of this trade. Arnould Ins. p. 43. Both parties, then, knew that the Helen did not and could not go to the city of New Orleans : they contracted then for insurance so far as the Helen went ; they named that vessel as the vehicle of transportation, and very properly, too.—1 Arnould Ins. 170. The insurance, by the terms of the contract, is co-extensive with the voyage that in the usual course of trade would be made in the Helen—the vessel named in the policy. The contract is for indemnity against loss on a voyage by the Helen, from the port of Mobile to the port of New Orleans, beginning the adventure with the loading upon the Helen, and continuing till safely landed at the port of New Orleans.

Now, what is meant by the term ' port of New Orleans' is to be ascertained by the opinions of mercantile men, cognizant of the usages of trade.—1 Arnould Ins. 342, 434, 77 ; 1 Burr. R. 349 ; 3 Camp. R. 16, 309 ; 1 Bingh. R. 445 ; 2 Taunt. R. 406. And this definition is not governed by geographical or

political divisions. The port of New Orleans, in mercantile understanding, embraces the wharves on Lake Pontchartrain, as well as the levee on the Mississippi river. According to this understanding, the Helen was at the port of New Orleans when she reached her usual wharf at the end of the railroad, and the marine policy there ceased. It had no operation on land, or after the goods had been discharged from the vessel on land, where it was customary for the vessel to discharge. It is admitted that lighters, or vessels used to transport goods from a vessel to the shore, are generally deemed part of the ship, and goods while so laden continue covered by the policy ; but in order to have that effect, they must be vessels of water carriage : if the goods reach the land, the maritime service is performed. If there be two modes of transporting goods from the ship to their port of destination—one by boats, and another by land—if that by boats is adopted, the insurance still covers the goods ; if that by land is used, the insurance ceases, though the liability of the carrier continues, whichever be adopted.—5 Martin's R. N. S. 386 ; 2 Mass. 426 ; 1 Arnd. Ins. 437 ; 4 T. R. 206 ; 6 Mass. R. 179 ; 1 Burr. R. 341–9. So in this case, the policy covered the goods till they reached the terminus of the voyage of the Helen, to-wit, the wharf on Lake Pontchartrain ; the land carriage beyond that point was not covered by the policy.—3 Camp. R. 161 ; 1 Arnd. 437.

The propriety of this construction of the policy is confirmed by the evidence of the only two cases that had occurred prior to this loss, where the question had been considered by insurers and insured. A large premium was demanded, and paid, for the additional risk contracted, and the policy in its terms is made to extend *to New Orleans*, instead, as in this case, to the PORT of *New Orleans*. These instances establish the custom in Mobile, and are binding upon the parties.—1 Bing. R. 61 ; 23 Ala. R. 420 ; 14 How. R. 362.

2. As to the landing of the cotton from the boat :

The proof is, the boat arrived at the wharf as usual, and as usual began to unload her cargo, on to the wharf. She had so unladed from her, and had landed on the wharf, 134 bales of the plaintiffs' cotton, when the fire occurred, which destroyed the wharf and all the goods thereon. "The landing

had been in all things as was usual and customary with the Helen, and nothing more remained to be done by the crew and officers of the Helen, *about the landing of said* 134 *bales:*" but the obligation of the boat continued on its contract, evidenced by the bill of lading, and confirmed by the custom of the boats to transport the goods to the city of New Orleans. When thus on the wharf, the crew of the boat usually exercises no further control over the cargo—it is then ready to be taken, and transported to its place of final destination by the railroad company. Of course, the obligation of the boat still continuing to transport it on, it would be incumbent on its officers, as common carrier, to keep charge of the goods, though landed from the vessel, not only on the wharf, but until they were laden on the cars, and even delivered to the consignee in the city.

The question here, however, does not relate to the duties of the boat, nor what description of delivery of the goods will discharge the liability of the boat; but is, what is a *safe landing*, to discharge the liability of the underwriter. The two contracts (of carriage and insurance) are not by any means co-extensive—they may very well begin and end at different periods of time, and in very different places. It is true they relate to the same subject, (in this case 198 bales of cotton,) but the liability in the one case does not at all ascertain the liability in the other. They are two entirely different and distinct contracts, made by different parties, and by no means imposing the same liability. The carrier undertakes to carry from point to point, and *to deliver safely and in good order to the consignee*, certain specified perils alone excepted.—Ang. on Carriers, § 282. The underwriter on a marine policy nowhere undertakes for the *delivery*, but only contracts to indemnify the insured against losses from certain perils *while in the process of marine transportation;* and his liability is by the contract made to cease the moment the goods are safely landed.—See 1 Arnd. Ins. pp. 11, 12 ; *ib.* 432, 433. Mr. Arnould (vol. 1, p. 339) remarks,—"In order to charge the underwriter, it is not enough that the loss should have happened at sea: it must also have taken place in the course of a navigation comprised within some given period of time, or *between two local points* specified in the policy, as the limits

or termini of the risk. In a policy on goods, the risk commences at the port of lading ; the terminus *ad quem*, or point at which the risk ends, is the port of the cargo's discharge."

In our view, the court below erred in not sufficiently distinguishing between these two liabilities : he made the liability of the insurer co-extensive with that of the carrier. The carrier, in general, is bound to deliver the goods he undertakes to transport, to the consignee, or he must show a discharge of the goods under circumstances such as the custom of the trade, and by consequence the law, deems equivalent to such personal delivery ; and very properly, too, for the carrier has the personal charge of the goods : they are placed in his care and custody. But not so with the insurer : he has nothing to do with handling the goods; he cannot deliver the goods, nor superintend the delivery. If so, he would be very much in the power of the carrier ; and, unless he undertake it expressly by his contract, should not be held to a guaranty of his conduct. The insurer undertakes against the barratry of the master, but he assumes no other risk ; and any loss that can be traced to the negligence or misconduct of the master, not amounting to barratry, must be borne by the vessel, and not by the insurer.—14 How. R. 351, 367. If the loss in this case arose through the negligence or misconduct of the master, in landing the goods at an unseasonable hour, or in an improper manner, the insurer is not liable. The assured, and not the insurer, warrants the competence and skill of the crew.—1 Arnd. Ins. 681. This falls within the implied warranty of seaworthiness.

We insist, then, that a delivery of the goods to the consignee, or some one for him, is not necessary to discharge the underwriter, even though it were necessary to discharge the carrier. All that is necessary to discharge the insurer is, that the goods should be safely transported on the voyage described, and safely delivered, or discharged on land from the vessel, at the usual place of landing. The connection between the vessel and goods must be severed by the safe discharge of the goods on the usual pier or wharf. When that is done, the voyage is ended—the contract of assurance has been performed. Mr. Arnould defines "SAFELY LANDED," to mean "*safely delivered on shore, at the ordinary wharves and*

*quays, or customary landing places, within the limits of the port of discharge.*"—Vol. 1, p. 434. And again, p. 437,—" Whenever the goods can be considered as *having been landed according to the usual course of business,* at their port of destination, the risk on the goods ends, though they may *never have been delivered into the hands of the consignees.*" And again, (same page,) " The general rule is clear, that the underwriter in a sea policy insures only against sea risks ; the risk on goods, therefore, ends, directly they are put on *terra firma,* unless they are placed there only for a temporary purpose, or under such circumstances as to be protected by the usage of the trade ;" as in the Bank-saul case.—1 Burr. 341. So Lord Ellenborough, 3 Camp. R. 161,—" The goods were landed according to the usual course of trade at the port of Archangel. This is all the underwriter undertook for. The policy says nothing of the goods being in the possession, or under the control of the consignees. * * * " If the goods are once landed in the usual course of business, the underwriters are not liable for any subsequent loss. It was meant to indemnify against marine, and not terrene perils." In this case (3 Camp.) the goods were taken possession of by Government officers, before the vessel reached the land, and were never seen by the consignees. A similar case is found in 8 Cranch R. 75. In both cases, the goods were held to be safely landed within the policy. In the case at bar, the record shows a landing had been made of the 134 bales, in all things as *was usual and customary* in this trade, and that *nothing more remained to be done, about the landing of this cotton, by the officers and crew of the boat.* It thus shows a complete landing or severing of the 134 bales from the boat, the vehicle of transportation, at the end of the voyage, at the place and in the manner usual in the trade, within the terms laid down by the authorities upon this subject ; and appellant contends the risk assumed by him had terminated, and the policy was complied with.

The appellant's contract was only to indemnify against certain dangers *while on the voyage from Mobile and until safely landed at the port of New Orleans.* It is well settled, in such a case as this, that the customary place of landing her cargo by the vessel insured upon would be the place at which

the voyage would be construed to terminate ; that place was indisputably the wharf at Lake Pontchartrain. Our contract was, then, only to indemnify the assured against the losses which might come to the goods while on board the vessel, on the voyage from Mobile to the customary wharf of the Helen, at Lake Pontchartrain, and *until there safely landed*. Now what is meant by *safely landed?* Our contract was a maritime contract. It was confined by its terms to the dangers of the voyage, and the very essence of it was the protection of the assured against the dangers of the *navigation* between the two termini of that voyage. When, then, we speak of the goods being *safely landed*, it is evident we mean the goods are to be landed so as to be *secure from the perils of the voyage;* and, this being done, our contract is complied with. We contract only to furnish the assured with indemnity *against the marine, and not against the terrene risks.* We contract that assured shall not suffer from the perils *of the voyage*—not that we will protect them from perils accruing *after the voyage is at an end.* The goods, then, having reached the wharf at Lake Pontchartrain, which is shown to have been the usual and proper place of discharge, and the goods having been there discharged on terra firma, at the customary place, and in the customary mode, and nothing more remaining to be done with them by the boat, which was the vehicle of *marine transportation;* surely, all the marine transportation was at an end, so far as the goods in question were concerned. The marine risks had been run, the perils of the voyage were at an end, and the goods were safely landed within the meaning of the insurance policy.

The case 6 Mass. R. 197 was decided on this principle, that a complete severance of goods and vessel had not taken place, according to the custom of the trade. A box of opium was taken ashore, for the purpose of trading with the natives, and was intended to be delivered to the chief, in pursuance of a previous bargain then to be completed. But foul play was suspected, and the opium was returned to the boat ; and while there was seized by the natives, and forcibly taken from the master of the vessel. In this case, no landing had taken place, according to any regular custom of the trade, nor had the crew placed the opium on land, as an ending of the voyage

as to it—the duty of the crew as to it had never been fully terminated. It is true, the facts show that 134 bales only, and not the whole 198, had been landed. The remaining 64 were, however, received by the consignee without objection that the whole were not tendered to him. Even upon the notion that the contract was entire, and that plaintiff, or his agent, the consignee, was entitled to insist that the whole shipment should be landed before his policy ceased to protect him, he has himself severed the contract by accepting, without objection, a portion instead of the whole, and is not entitled to insist upon the objection. Besides, it was not necessary the whole should be landed ; it is sufficient if the bulk of the shipment be landed.—1 Arnd. Ins. 441. In this case, the bulk, or the larger portion of the shipment, was landed in the usual manner, before the loss occurred. Moreover, this contract was, at its inception, a severable contract, and the landing of each bale of cotton covered the contract as to that bale. Any other construction of the contract would lead to monstrous injustice.

Even if we apply the same rule to the insurer that is applied to a carrier in an analogous case, we find that what is a delivery depends on the custom of the trade. We contend, that in this case the duty of insurer and carrier is not commensurate, because the liability of the carrier extended to a delivery of the goods at the city, while that of insurer terminated with the voyage—that is, at the wharf. But if the carriage terminated at the wharf, what facts would amount to a delivery must be determined by the custom : the custom of the boat would settle the question ; and a shipper by the boat would be held by that custom.—Flanders on Shipping, p. 278 ; Angell on Carriers, 298, 314–15 ; 16 Verm. 52 ; S. C. 18 ib. 131 ; S. C. 23 ib.; 1 Bail. R. 553 ; 17 Wend. R. 305–6 ; 1 Parsons on Contracts, tit. Com. Carrier. If no notice of the arrival of the boat was required by the custom, notice was not necessary. The Helen was a regular packet, and had regular times of arrival and departure, and a regular place and manner of lading and of receiving her cargo.

The charges asked were all proper and correct, and should have been given. The fact sufficiently appears that the jury were misled by the ruling of the court below, and that too

much stress was laid on the liability of the carrier as furnishing the rule for the insurer. It is respectfully submitted, that the court mistook the principle on which the cause should be decided.

ROBT. H. SMITH, *contra:*

1. The first question to be arrived at is, what was the charge of the court; for it is an error to suppose, as contended by the appellant's counsel, that the charges, all taken together, assert the doctrine, that the risk continued until the cotton was delivered to the consignee, or to some one for him. It is certainly true that the original charge asserted this proposition; but it was expressly retracted by the qualification of the seventh charge asked, which asserted, that the risk was terminated if the goods were landed from the boat at the usual place of unloading her cargo, and in the mode and manner customary in the trade, and that it was not necessary that the goods should be actually delivered to the consignee. In the explanation given of the fifth, sixth, and seventh charges, the principle is asserted, that the risk continued until the goods were landed at the place where it was usual for the consignee to take charge of them; and in this the court but followed the language of C. J. Marshall, in Gracie v. Marine Insurance Co., 8 Cranch's R. 81, which opinion, it will be seen from the language used, the court read to the jury. The error in giving the charge in the first place, that there must be a delivery to the consignee, or to some one for him, is cured by its subsequent withdrawal.—Smith v. Maxwell, 1 S. & P. 221.

2. Was there a safe landing of the 198 bales? The undisputed facts were, that while the boat was unloading, and when she had only thrown off 134 bales, those 134 bales were consumed. The policy, by one entire contract, covered the whole lot of cotton at one gross sum; and if there was no safe landing of any part, within the meaning of the law, until all were safely landed, then the court might very properly have told the jury, 'It is conceded that, when the loss occurred, only part of this cotton was landed; but the risk continued on all of it until the whole was safely landed, and a part being burned before the whole was landed, the underwriters are liable for that which was lost, even though the boat were at the

port of New Orleans.' This is the law of the case; unless there is something in a contract of insurance which exempts it from the effect of a rule applicable to all other entire contracts.—See the cases collected in Reavis' Digest, pp. 351–54; Evans & Arrington v. Keeland, 9 Ala. 51 ; Chitty on Contracts, 7th Amer. edit., pp. 446, 447, 737. That this is also the law of contracts of insurance, is well settled.—3 Kent's Com. 309; Gardiner v. Smith, 1 Johns. Cas. 141; 1 Arnould on Insurance, p. 434, note 1; Gracie v. Marine Insurance Co., *supra.* It matters not, then, whether other parts of the charge were correct or incorrect ; for, these facts being ascertained, the plaintiff was bound to recover, and the other charges, even if erroneous, could have worked no injury, and consequently furnish no ground of reversal.—Donley v. Camp, 22 Ala. 659; Porter v. Nash, 1 *ib.* 452 ; Caruthers & Kinkle v. Mardis' Adm'rs, 3 *ib.* 599 ; Mayor v. Emanuel & Gaines, 9 Port. 403; Horton v. Smith, 8 Ala. 73; Randolph v. Carlton, *ib.* 607; Smith v. Houston, *ib.* 737; Shepherd v. Nabors, 6 *ib.* 631.

It is attempted to answer this proposition, by saying that an acceptance of the part saved was a waiver of this. This position amounts to this : If the bales burned had been lost at sea, then, by receiving those not lost, we would have waived all claim to anything for those lost. But the correct proposition is, that if we had a right to insist on a total loss, it would have been a waiver only as to that received. For the appellee it is contended, that we were bound to receive the bales which were not at all injured, and that all we could have claimed payment for was a *total partial loss.* The risk continued as to the whole until all were safely landed, and therefore the lost bales were covered by the policy when destroyed ; but it does not follow that we were not bound to receive those which were uninjured. These latter were under the policy at the time, but ceased afterwards to remain under it by being saved and delivered. The general rule of waiver of performance of contracts has no application to a policy of insurance, because it is a contract of indemnity merely, and the measure of recovery is the loss sustained. If the loss is only partial, it does not justify the insured in going for the whole policy : he must receive the part saved, and can only ask indemnity

for that lost.—Franklin Fire Ins. Co. v. Hamill, 6 Gill's R. 87; 1 Arnould on Insurance, p. 8.

There has been some contrariety between the decisions of England and those of America, as to whether the insured can go for a total partial loss of goods which, by the memorandum to the policy, are free from average—that is, whether, if part of the goods, which are in separate parcels, are lost, and part are uninjured, and the goods are by the policy and memorandum of that class for which the insurers are not bound for an average loss, the insured can recover for a total loss of those separate parcels which were destroyed; or whether, the insurance being a whole thing, and the articles not subject to an average loss, the insured himself must bear the loss. It is well settled in England, that although the insurers are by the policy exempted from accounting for anything less than a total loss; yet, when the thing insured consists of several distinct parcels, some of which are totally lost, and some uninjured, the insured may recover for the whole value of the part destroyed, for and on the ground of a total partial loss. But this doctrine has been denied in America, and it has been here held that the insured, in such cases, can recover nothing. Arnould on Insurance, vol. 2, pp. 1041–45; Hill v. London Assurance Co., 5 Mees. & W. 559, and note. As plaintiffs' cotton was not among the articles which by the policy are exempted from average, the doctrine, no matter how held, has no influence on the case at bar, further than to illustrate the principle, that at all events, and whether the law be as ruled in England or America, we were bound to receive the goods which were uninjured. When received, the question might come up, if they were memorandum articles, whether we could go for any loss, or whether we could treat it as a total loss of part. But the question discussed never could arise, except upon the predicate that the insured were bound to receive the goods which were uninjured. These authorities (and the American more conclusively) establish that, where there is a partial loss, the insured cannot recover for more than a partial loss, and consequently is bound to receive the goods not damaged or lost.

It is well settled, that though the existing state of things at the time of abandonment be such as to justify an abandon-

ment for a constructive total loss; yet the right of the insured to recover for more than an average loss depends upon the facts existing at the time the action is brought—that is, conceding for argument that, on the burning of the 134 bales, we might have abandoned for a constructive total loss; yet, inasmuch as it subsequently turned out that the loss was only partial, we could only recover for the partial loss. It follows, then, that we rightly received the sixty-four bales not burned, and were compelled to receive them; and this being so, the act was no waiver of any right.—Arnould on Insurance, vol. 2, ch. 8, pp. 1059–60, and the chapter generally.

Suppose, however, that the insured had a right to reject the 64 bales which were saved,—the insurers tendered them, and they were received; how can this be a waiver of anything but the (supposed) right to treat them as lost? how can it be an admission that the other cotton, in a different condition as to landing, was landed? The doctrine asserted is this— because it is admitted that one part was afterwards safely landed, therefore it is an admission that other cotton, burned up before this had left the boat, was also safely landed.— Chitty on Contracts, pp. 446–7. This question, though not prominently presented, is in fact decided in Alrich v. Equitable Ins. Co., 1 Woodbury & Minot's U. S. C. C. Rep. 273.

3. If necessary to proceed further with the argument, it is contended that there was no safe landing of any part of the cotton. It must not only be landed, but "safely landed"— that is, placed in safety on *terra firma;* so landed as to be beyond immediate danger. It never was safely landed; for, in the very act of being rolled off, it took fire; and who can say which of the bales were landed while the fire was burning, and which not? Cotton so rolled off at night, without any one to receive it, or protect it against fire and other casualties, cannot be safely landed; and, even if so landed at the city, it would not be a termination of the risk.—Gardiner v. Smith, 1 John. Cas. 141; Mass. Fire & Marine Ins. Co. v. Parsons, 6 Mass. 197; Pelly v. Royal Exchange Co., 1 Burr. 341; Gracie v. Marine Ins. Co., *supra.*

4. By the custom of the trade, the voyage was partly a land risk, and its terminus was the railroad depot in the city, although the boat in fact stopped at the lake, and employed the

railroad as a tender to complete her trip. It is well settled, that goods are considered on board of the ship, while in a lighter or shallop, in all cases where, by the usage of the place or trade, it is customary to unload by lighter or shallop. Though the ship may be at her usual place of mooring, or incapable of proceeding further, and though the goods be in a lighter or shallop; still, under the policy, they are on shipboard.—Arnould's Ins., vol. 1, pp. 435–6, and cases there cited. Although the wharves at Pontchartrain, in general mercantile usage, may be considered as the port of New Orleans; yet, by a further well-known usage of trade, steamboats from Mobile take their cargoes to the city, employing the railroad as their agent to perform a part of the trip, for the whole of which the boat is bound. The trade considers the goods on board of the boat until landed in the city. The contract was made in reference to this usage; and no reason is perceived why the goods, when on the railroad, may not be considered as on the steamboat, as well as goods on a lighter or shallop may be considered on the ship. In either case, it is a departure from the letter of the contract, to arrive at its spirit and intent. The port of New Orleans, in the sense of both insured and insurers, was the port of New Orleans as understood and meant by the vessel engaged to carry the goods insured. The question is, not what was the port of New Orleans in a general sense, but what was it as to this shipment. If it is said, this is a marine policy, and how can it cover a land risk; the answer is, just as well as a policy, covering goods while on a named ship, continues though the goods have left the ship safely and are on another and a different vessel. It is the intention of the parties to the contract, solved by custom, that enlarges the sense of words which have a more limited meaning in ordinary signification. There is no greater difficulty in treating the railroad carriage as a part of the boat's trip, than there was in treating the goods as still on shipboard when they were actually on land, as was done in the cases in 1 Burr. 341, 6 Mass. 197, 13 Pick. 543. Suppose a boat is navigating a stream where, by means of a rapid or shoal, all boats have to unload and send their cargoes around the obstruction by a railroad or canal, the boat going through light and continuing her voyage; and that a loss should occur on the railroad or canal;—would it be con-

tended that it was not covered by the policy? The insurance in this case continued while the goods were on the boat, and until safely landed at the place for which the boat is bound, not corporally, but by herself or agent; and that place was the railroad terminus in the city.

It is no answer to this, to say that a higher premium would be charged for voyages by water to the city. It does not follow that the insurer would not charge less, when part of the trip was to be made by railroad, which is a safer mode of conveyance, and by the use of which the boat is able to make an inland voyage. It is not to be presumed, in the vast demands of commerce and all the anxious solicitude it brings, as well as the keen penetration and guarded caution it produces; and in this day, when insurance is the great stay and support of commerce, that the vast millions of goods passing between Mobile and New Orleans should have gone over this road without insurance. Yet no case could be shown, where it was ever pretended that goods on the road were not considered as protected by the marine policy. The appellant showed two cases, where the anxieties of commerce had taken policies to cover goods to New Orleans, and while in warehouse there. Such was the risk "proposed and taken." These two cases establish no usage.—Adams v. Otterbank, 15 How. 539. But they are very persuasive to show that these two individual transactions furnish the only evidence that could be adduced, from which even an argument could be drawn in favor of the termination of the risk short of the city. They tend strongly to prove, either that commerce has shown herself so blind as to have passed her millions annually over this road without insurance, or that the construction we insist on is correct; for it cannot be presumed, if any other case in point could have been given, that the positive proof would not have been made. It will be observed, too, that the boat's bill of lading says, "to be delivered at the port of New Orleans"; and the policy says, the risk is to terminate "at the port of New Orleans." The usage shows that the expression, in the bill of lading, means the city itself; and yet the court is asked to tell the jury, that the same words in the policy, which was entered into in reference to this boat, mean the wharves at Lake Pontchartrain.

7

CHILTON, C. J.—It is a rule of construction, settled by numerous authorities, that every usage of trade, which is so well settled, or so generally known, that all persons engaged in that trade may fairly be considered as contracting with reference to it, is regarded as forming part of every policy designed to protect risks in that trade, unless by the express terms of the policy, or by necessary implication, such inference is repelled.—1 Duer on Ins. 195, §§ 42, 43 ; *ib.* 265, §§ 60, 61, 62 ; Arnould on Ins. (1850 edit.) p. 65 ; Hughes on Ins. 109–10; 1 Phillips on Ins. (edit. 1853) 79, *et seq.*

The contract declared on is essentially a *marine* policy, providing for protection of goods shipped on board the Helen, upon a *sea voyage,* and against *sea risks ;* and there is nothing contained in this policy which, by a fair construction, can be made to extend to and cover *terrene risks* after the cotton shall have been *safely landed* at the usual place of discharging her cargo by the vessel ; unless, indeed, under the facts, we are required to hold that the port of New Orleans means the port at the city, and not the port which is known by the same name on Lake Pontchartrain, where the cargo was put on shore.

It is conceded, that the policy is to be construed liberally for the benefit of the assured, and with a due regard to its design and object as an undertaking to indemnify.—Kent v. Bird, Cowp. R. 585; Godsall *et al.* v. Boldero, 9 East, 72, 82; Hughes on Ins. 145, marg. page ;—per Lord Ellenborough, in Bainbridge v. Neilson, 10 East, 144; Pelley v. Royal Exchange Assurance, 1 Burr. 349; Wolfe v. Horncastle, 1 Bos. & Pul. 322 ; Kains v. Knightly, Skinn. 55; 3 Saund. R. 200 a, note 1. "It is certain," said Lee, C. J., in Pelley v. Royal Exch. Ass., *supra,* "that in construing policies, the *strictum jus,* or *apex juris,* is not to be laid hold on ; but they are to be construed largely for the benefit of trade and *for the insured.* Nevertheless, as was said by Lord Ellenborough, C. J., in Robertson v. French, "the same rules of construction which apply to all other instruments, apply equally to this instrument of a policy of insurance—namely, that it is to be construed according to its sense and meaning, as collected in the first place from the terms used in it, which terms are themselves to be understood in their plain, ordinary, and popular sense, unless they have generally, in respect of the subject-

matter, as by the known usage of trade, or the like, acquired a peculiar sense distinct from the popular sense of the same words; or unless the context evidently points out that they must, in the particular instance, and in order to effectuate the immediate intention of the parties to that contract, be understood in some other special and peculiar sense. The only difference between policies of assurance and other instruments, in this respect, is, that the greater part of the printed language of them, being invariable and uniform, has acquired from use and practice a known and definite meaning, and that the words superadded in writing (subject, indeed, always to be governed in point of construction by the language and terms with which they are accompanied) are entitled, nevertheless, if there should be any reasonable doubt upon the sense and meaning of the whole, to have a greater effect attributed to them than to the printed words, inasmuch as the written words are the immediate language and terms selected by the parties themselves for the expression of their meaning, and the printed words are a general *formula*, adapted equally to their case and that of all other contracting parties upon similar occasions and subjects."—4 East, 135–36.

The language in the policy before us, as we have said, provides against loss from certain perils, while the goods are in process of *marine transportation.* They are shipped on board the Helen, upon a *voyage* from the port of Mobile to the port of New Orleans, enumerating the perils and adventures usually inserted in *marine* policies; and it fixes the *termini* of the risk, the point *a quo* being the port of Mobile, "and to continue and endure until the said goods shall be safely landed at the port of New Orleans."

We must not confound the obligation of the insurer with that of the carrier. The boat, by the bill of lading, was obliged to have the cotton taken to the city, and the consignees were not bound to receive it at the lake depot of the railroad; but it by no means follows, that the insurance extends to this terrene transportation. According to its terms, it closes with the terminus of the voyage of the Helen after the goods shall have been safely landed. There is no proof whatever to show that such policies were regarded by merchants, insurers, or shippers, as usually embracing such

risks, and we have found no case which authorizes the extension of a marine policy to cover land transportation. Whether, indeed, it would be competent to extend the language employed in this policy, by proof of usage or custom, so as to make it cover losses after the goods had been safely landed in the usual way and at the usual place of discharging the cargo by the Helen, is a question of some difficulty, and one which we are not now called upon to decide. So far as the proof goes upon this point, it is adverse to the construction contended for by the assured; two cases being shown where policies had been effected "*to New Orleans*", instead of the "*port of New Orleans*", in which it was considered by the parties that the risk continued to the city; but in both of those, a greater premium was paid than required to insure to the "port of New Orleans", as understood to be the point of discharging the cargo at the southern shore of Lake Pontchartrain. But we lay no stress on these cases as establishing a custom. We rest our decision upon the *terms of the policy itself*, considered, of course, with reference to what is usually done by such a vessel, with such a cargo, in such a voyage; all which must be considered as forming a part of the policy, as much so as if inserted in it.—1 Burr. 350; 3 Saund. 200 a, n. 1. Both the assurer and insured are chargeable with a knowledge of the course of this trade, and are presumed to contract with reference to it.—Noble v. Kennoway, Doug. 510; Salvador v. Hopkins, 3 Burr. 1712; Vallance v. Dewar, 1 Camp. 505, n.; *ib.* 508; 3 *ib.* 200; 1 Taunt. 463; Selw. N. P. 963; 1 Arnould Ins. 43; *ib.* 66; Hughes Ins. 146, bottom page.

The parties, then, knew that the Helen landed her goods at the port of New Orleans, *on the wharf at Lake Pontchartrain.* They knew this vessel did not go to the city of New Orleans;—they insert no words in the policy making the liability of the insurance company co-extensive with that of the carrier, nor extending it beyond a "safe landing of the goods" upon the *termination of the voyage;* no custom or usage is shown to extend the *voyage,* and of consequence, the risk, to the city of New Orleans; and such being the case, we should do violence to the terms of their contract to continue the risk after the voyage had terminated and the goods were safely

on land at the usual place of discharging them. The risk is at an end, whenever the goods can be considered as landed according to the usual course of business, at the accustomed port of destination, although they may never have been delivered into the hands of the consignees.—1 Arnould on Ins. 437; Galliffe v. Bourne, 4 Bing. N. C. 314; same case, in House of Lords, 7 M. & Gr. 850.

It follows from what we have said, that the court erred in the charges, which held the insurer liable until the goods were delivered to the consignee, or some one for him. So, also, in the qualification given to the charges asked, which assumed that the goods must be landed at the place where it is usual for the consignee to receive and take charge of them. The delivery to the consignee, as well as the usual place where he was accustomed to receive and take charge of the goods, could not affect the liability of the insurer, so as to extend the risk beyond the terminus of the voyage. These were questions between the consignee, or owner, and the carrier. It was certainly competent for the parties to contract for covering losses which should come to the goods upon their marine passage and until safely landed, leaving their overland passage unprotected by the policy. This, we have held, was the effect of the policy before us; and as the terminus of the marine risk was not the terminus of the transportation contracted for by the carrier, it was erroneous to make the liability of the insurer depend either upon the delivery of the goods to the consignee, or at a place where he usually received and took charge of them.

The next question which arises is, did the errors which we have noticed injuriously affect the rights of the insurer. If they did not, we cannot reverse; for it is well settled, that an error which can do no injury, works no reversal.—Porter v. Nash, 1 Ala. 452 ; Caruthers v. Mardis' Adm'r, 3 ib. 599; 9 Por. R. 403 ; Donley v. Camp, 22 Ala. 659; 8 ib. 737, 37.

If the contract was entire—if, in other words, the engagement to safely land the 198 bales of cotton was not complied with until the whole were landed in safety, then the errors of the court worked no injury, since it is conceded that only 134 of the bales were landed, and these were consumed by fire before the others were put on shore.

Waiving the fact, that the first count in the complaint expressly states that the cotton was valued at $50 per bale, and the statement contained in the bill of exceptions, that " the plaintiff proved the contract of insurance with the defendant upon 198 bales of cotton, valued at $50 per bale," &c. ; we think the contract must be regarded so far severable as to exonerate the underwriters for that portion which was safely landed. The contract is one of indemnity. The valuation is inserted by the agreement of the parties, that in case of loss, proof of value may be dispensed with. But where the articles are separate, and each parcel is unaffected in value, whether considered separately or aggregately, there is no good reason why the failure safely to land one bale should make the underwriters liable to pay the aggregate value of the 198 bales. It could not be maintained that the underwriters would have been exempt from liability if the appellees, after effecting the policy upon the 198 bales, had only shipped 197, and these had been destroyed by some of the perils embraced by the policy. They could not be allowed to say, " True, the loss has accrued by reason of a risk insured against ; but the assured failed to ship the number of bales specified in the policy, and the contract was entire : we must be liable for the 198 bales, or for nothing." The rule is, that if less than the number specified in the policy are shipped, the assured has the right to demand a corresponding return of the premium.—2 Arnould on Ins. 1227. We think the cases of Gracie v. The Marine Ins. Co., (8 Cranch, 75), and Gracie v. The Maryland Ins. Co., (8 Cranch, 84), fully sustain the view we have above taken. In the latter case, a part only of the cargo was landed, and the policy provided for the continuation of the risk " until the said goods shall be safely landed," &c. If no part of the goods could have been " safely landed" until the whole were landed, then, in that case, there would have been a total loss, and the assured would have been unaffected by the warranty against particular average loss. But the court held otherwise, and discharged the underwriters, upon the ground that the loss was partial, a portion of the goods having been safely landed within the meaning of the policy, and hence the assured was affected by the warranty against particular average.

Mobile Marine Dock & Mutual Insurance Co. v. McMillan & Son.

We have seen that the consideration for the insurance, the premium, is susceptible of apportionment—to-wit, three-sixteenths on the value of the cotton shipped; and that each bale may be severed from the others without affecting its value. The true rule, then, in such cases, is to consider the contract as entire with respect to each measure, and not in respect of the whole lot.—Story on Con. § 24, n. p. 18; *ib.* § 21, *et seq.*

The case of Gardner *et al.* v. Smith, 1 Johns. Cas. 141, is relied upon by the counsel for the appellees. In that, by the terms of the policy, the risk was to continue until twenty-four hours after the goods named in the margin were landed; the risk providing against seizure of the goods as illicit trade. A portion of the goods had been landed more than twenty-four hours, when the whole were seized as illicit. Justice Lansing said, "The insurance being entire, we are of opinion, that the risk continued on the entire goods, until twenty-four hours after *all* of them were landed."

Perhaps a distinction may be taken between the case cited and the one before us; but if it be parallel, we are not disposed to follow it. Nor are we alone in doubting its authority. An able writer upon the law of insurance does not "hesitate to doubt it, and to state it as the better doctrine, that the risk terminates on each parcel at the end of the twenty-four hours after it is landed."—See 1 Phillips on Ins. (edit. 1853), p. 539, § 972.

After the best consideration we have been able to bestow upon the case, we are satisfied the court below mistook the law in the charges which conflict with the views above expressed. The judgment is, therefore, reversed, and the cause remanded.