## SMITH & HOLT *vs.* MOBILE NAVIGATION & MUTUAL INSURANCE CO.

[ACTION ON MARINE POLICY OF INSURANCE.]

1. *Construction of policy as to liability of insurers.*—A marine policy of insurance, on goods shipped from New Orleans to Mobile, containing a stipulation that the risk on the goods shall commence "from and immediately following the loading thereof on board the sail vessel or boat at New Orleans," does not cover a loss by fire while the goods are on the wharf at the lake end of the Jefferson and Ponchartrain railroad.
2. *Admissibility of custom.*—Parol evidence of a custom cannot be received, to show that a marine policy of insurance on goods shipped from New Orleans to Mobile, the language of which is plain and unambiguous, covers the overland transportation of the goods by railroad.

APPEAL from the Circuit Court of Mobile.

Tried before the Hon. C. W. RAPIER.

THIS action was brought by the appellants, and was founded on a marine policy of insurance on 300 pieces of

bagging, to be shipped from New Orleans to Mobile on board the steamboat *Helen;* 185 pieces of which were consumed by fire, while on the wharf at the lake end of the Jefferson and Ponchartrain railroad, about eight miles from the city of New Orleans. The stipulation in the policy, as to the commencement of the risk, was ·as follows; "Beginning the adventure upon the said goods and merchandizes from and immediately following the loading thereof on board the said vessel *or boat* at *New Orleans* aforesaid;" the italicized words being written, and the others printed in the usual form.

It was proved, on the part of the plaintiffs, that the steamboat *Helen*, the boat named in the policy, was engaged in the Mobile and New Orleans trade by way of the lakes, and was unfitted for the river trade, as also for the trade by way of the canal; that her regular course of trade was to land at the lake end of the railroad, and there receive and discharge her freight; that the plaintiffs' bagging was delivered to the Jefferson and Ponchartrain Railroad Company, at the city terminus of their road, was received by them for the steamboat *Helen*, and receipts therefor taken from them, expressing on their face that the bagging was "received in good order on board the steamer *Helen;*" and that a portion of the bagging was consumed by fire, after it had been deposited on the wharf at the lake end of the railroad, and before it had been taken on board of the boat.

Robert S. Bunker, a witness for plaintiffs, testified, "that he had been engaged for many years in the mercantile and insurance business in Mobile; that he was now, and had been since the year 1850, the secretary of the Alabama Life Insurance & Trust Company in Mobile, and had been engaged in the insurance business in Mobile for many years prior to 1850, as agent for other insurance companies; that he was acquainted with the general usage and understanding of merchants and insurers engaged in the business between Mobile and New Orleans; that insurance on goods from New Orleans to Mobile was generally made by policies substantially the same in form as that sued on in this case; that he considered and believed

the general understanding of merchants and insurers engaged in business between those two cities to be, that goods insured by such a policy as that here sued on were covered by the policy while in transit from one city to the other, and whilst on the railroad and wharf; that on inquiry of him, as secretary of the company of which he was an officer, before the loss for which this suit is brought, he had replied that such was his understanding of the effect of the policy; that he knew of no case having arisen before the fire mentioned in this case, touching the question whether such a policy covered the railroad and wharf risk."

Other witnesses for the plaintiffs testified, that no separate charge was ever made for freight by the railroad, but that the boat receipt covered all the freight; that bills of lading are always given upon the presentation of the boat receipts, which are signed by the receiving clerk at the railroad depot, without inquiry as to the goods being actually on board of the boat; and that on two occasions, within their knowledge, insurance companies in New Orleans had voluntarily paid for similar losses under similar policies. Several witnesses for the defendant, on the other hand, testified, that they had never heard of the existence of any such custom as that spoken of by the witness Bunker.

This was, substantially, all the evidence in the case.

The court instructed the jury, "that one witness was not enough to prove a general usage or understanding, where there was conflicting evidence as to its existence; that as to the general understanding to which the witness Bunker testified, though the plaintiffs insisted that there was other evidence before the jury tending to prove its existence, the court considered that Bunker was the only witness who proved it, and therefore instructed them that his evidence did not prove a custom, and that they should not consider it for that purpose in rendering their verdict; that the usage, or course of trade between Mobile and New Orleans, in reference to the receipt and transportation of goods by steamers between those two cities, by way of the lakes, could have no influence on the meaning or

construction of the policy in this case, or on the defendant's liability under it; and that the more general words in the policy, to the effect that the goods were insured 'from New Orleans to Mobile,' though in writing, were controlled and restricted by the words declaring that the risk commenced 'from and immediately following the loading thereof on board the vessel or boat.' "

The plaintiffs then requested the following charges:

"1. That the policy is to be construed liberally for the benefit of the assured, and with a due regard to its design and object as an undertaking to indemnify.

"2. That where, as in this case, part of the policy is printed, and part written, if there is any doubt about the meaning of the whole, the written words are entitled to have greater effect attributed to them than the printed words.

"3. That where the words of the policy are dubious, or employed with reference to the usages of trade, the meaning of the contract may be explained by parol evidence of those usages.

"4. That every usage of a particular trade, which is so well settled, or so generally known, that all persons engaged in that trade may fairly be considered as contracting with reference to it, is considered to form a part of every policy designed to protect risks in that trade, unless the express terms of the policy repel such inference.

"5. That if the jury believe from the evidence that there was a usage of trade between Mobile and New Orleans by way of the lakes, that boats engaged in that trade should receive their goods, to be carried from New Orleans to Mobile, at the railroad depot in New Orleans, and then and there give bills of lading for the same; and that the *Helen* was engaged in that trade; and that such usage was so well settled, or so generally known, that all persons engaged in that trade may fairly be considered as contracting with reference to it,—then that usage is to be considered as forming part of the policy in this case.

"6. That the usage of the boats, in receiving goods in the city of New Orleans, and there giving bills of lading for the same, and paying the freight on the railroad, is

evidence to which the jury may look in fixing the beginning of the risk.

"7. That it is for the jury, looking to the policy itself and the usage of the trade in which the *Helen* was engaged, to decide the point or place at which the parties intended the risk to commence; and if they believe from all the evidence that it was the design and intention of the parties that the risk should begin at the city of New Orleans,—then the plaintiffs are entitled to recover.

"8. That in weighing the terms of the policy as evidence, greater weight is due to the written words or clauses of the policy, as being the immediate language of the parties, than to the printed words or clauses."

These charges, severally, the court refused to give.

The jury having afterwards returned, and requested additional instructions, the court further charged them, "that if the evidence showed that the bagging was burned before it was actually laden on board of the boat, they must find for the defendant."

Exceptions were reserved by the plaintiffs to the charges given by the court, and to the refusals to give the charges asked; and these are the matters now assigned as error.

E. S. DARGAN, and WM. G. JONES, for appellants.

ROBERT H. SMITH, and P. HAMILTON, *contra.*

(No briefs have come to the reporter's hands.)

STONE, J.—There are two questions which distinguish this case from the Mobile Marine Dock & Mutual Insurance Co. v. McMillan & Son, 27 Ala. 77. First, the policy in that case insured the goods until they should be safely landed at the *port of New Orleans;* while by the policy in this record, the risk commenced immediately following the loading of the goods on board the said vessel or boat *at New Orleans.* Second, in that case, there was no proof that any insurance company or its officers had construed a policy such as this, as continuing the liability of the insurer after the goods were landed from the boat; in this

record, there is found the testimony of one witness, who swears that he is, and has been for many years, an officer in an insurance company in Mobile, and that he believes it to have been the general understanding of merchants and insurers in Mobile, that the liability on policies such as this extended to the transportation by the railroad, as well as to the transportation by the steamboat. Two other witnesses swear that, on a loss precisely like this, insurance companies in New Orleans acknowledged their liability by. making two payments to the assured, under policies in substance like the present.

We are perfectly satisfied with the decision made by this court in the case of the Marine Dock Co. v. McMillan, *supra;* and unless the two differences noted above require the application of a different rule, that authority is itself decisive of this case.

The expression found in this policy, to the effect that the risk shall commence "*at New Orleans,*" if there were no other words that qualify it, would certainly cover the loss complained of in this case. These words, however, do not stand alone. To give to them the effect contended for, would be, in effect, to expunge the others from the contract. We know of no rule of construction which will justify this. It is our duty, in construing written instruments, to give to every word and phrase some meaning, if possible. The clause we are considering, reads as follows: "Beginning the adventure upon the said goods and merchandizes from and immediately following the loading thereof on board the said vessel or boat at New Orleans." The *fact of loading* the goods *on the boat,* is as much the starting point of the risk, as is the place named, *at New Orleans.* If possible, then, we must harmonize these provisions. This we may do, by giving to the words, *at New Orleans,* the meaning which attaches to similar phrases elsewhere found: namely, when used to designate the place at which a marine risk shall commence or end, it may, according to the usage of trade, mean any of the loading and unloading points at or near said place, which the wants of commerce have rendered common.—See on

this point, Brown v. Carstairs, 3 Camp. 160; Moxon v. Atkins, *ib.* 200.

The fact that this is a marine policy, is strongly persuasive, if confirmation were necessary, that the parties intended to limit their contract to the period of time while the goods were water-bound.

If the policy had contained the distinct statement that the insurers only agreed to indemnify the owners of the goods while they were water-bound, no one, we apprehend, would contend that these terms could be shown by usage, or local custom, to embrace land risks. To allow such evidence, would be to change the entire character of the written contract. We think the language of this policy is equally as inflexible as the case supposed.

It is contended that, in construing this contract, we must give the greater weight to the written over the printed words. We admit the rule in a proper case. [See case of McMillan, *supra*.] We think, however, that this rule will not aid the appellants. The word *boat* is written, as well as the words *at New Orleans*. It was, then, the special intention of the parties to provide indemnity against losses while the goods were on the *boat*.

This construction leaves parties free to make their own contracts, and gives effect to them as made. Any other will give this policy a meaning and legal effect directly the opposite of what its words import. While we are willing to construe policies liberally in favor of the assured, we have no authority to make a new contract for them, or engraft upon one already made a provision which, it must be supposed, they have consented to dispense with.

Many good and substantial reasons may be supposed why the land risk was omitted from this policy. The insurance office may have been unwilling to insure against losses by land, without increase of premium. The assured may have been willing to incur the risks by railroad. At all events, they so made their contract, and they must abide by it.

If insurance offices insert clauses restrictive of their liability, commercial men may refuse to accept their

policies. They have no right to ask the courts of the country to relieve them from improvident bargains, when they present no other claim to relief.

The testimony of the witness Bunker did not in the least tend to prove a usage, or local custom of trade, or a technicality of commerce. If it tended to prove any thing pertinent to the issue, it was nothing more nor less than an attempt to *construe*—give the *legal effect* of—a written contract which fills over two folio pages of closely written manuscript. In all the latitude which has been sometimes accorded to local custom, we have found no case which justifies this extreme license. By universal consent, the construction of written instruments belongs to the courts of the country. We are unwilling to overturn this salutary rule of law.

The other two witnesses relied on to prove the usage contended for, do not pretend there was any such usage. All they testify is, that certain companies in New Orleans, by voluntary agreement, paid for similar losses, on similar policies of insurance. Why they did it, we are not informed. Their testimony is strongly persuasive against the existence of any such custom, for they say it was a new question. This subsequent act of theirs cannot certainly define a liability against others.

The language of this policy is plain and unambiguous. It states the beginning of the adventure, *immediately following the loading on the boat.* In the case of Barlow v. Lambert, 28 Ala. 704, we considered this question, and there held that proof of custom cannot be received "to give to plain and unambiguous words or phrases a meaning different from their natural import." We are satisfied with the principle there stated, and hereby reaffirm it.

The external circumstances which were proved in this case, raise no doubt as to the proper application of the words of this contract, on the point when the risk of the insurers commenced. We here adopt as a part of this opinion the language of C. J. Tindal, 9 Cl. & Fin., 565-6 : "When the words of any written instrument are free from ambiguity in themselves, and where external circumstances do not create any doubt or difficulty as to the

proper application of those words to claimants under the instrument, or the subject-matter to which the instrument relates, such instrument is always to be construed according to the strict, plain and common meaning of the words themselves; and evidence *de hors* the instrument, for the purpose of explaining it according to the surmised or alleged intention of the parties, is utterly inadmissible."—Addison on Contracts, 149.

We need not say what would be our opinion, if there had been proof tending to show that the phrase, *loading on the boat or vessel*, had a technical import in mercantile parlance; and that it meant, *taking control of merchandize to be loaded*. There was no such proof in this case.

It may be that the carrier in this case is liable. There is no proof in this record tending to show that the insurance office is.

We are satisfied that the charge given by the circuit judge, when the jury returned for further instructions, asserted a correct legal proposition; and without considering in detail the other rulings of the court, we have no hesitation in saying that none of them could have worked any injury to the appellant.

Judgment affirmed.