NEW-YORK,
May, 1806.

I. & C. Sleght
v.
Rhinelander.

## I. & C. Sleght *against* Rhinelander and others.

*A policy of insurance contained the following memorandum : " The vessel sails under a sea-letter without a register ; property warranted American." It was held that parol evidence could not be admitted to explain what was meant by a sea-letter, as the nature of the document was settled by public treaties and acts of congress. A sea-letter and a certificate of property, are distinct documents ; and sailing with a certificate of ownership is not a compliance with the warranty. Where money is paid into court under a rule on*

THIS was an action on an open policy of insurance, on the cargo of the brig *Three Friends*, on a voyage from *New-York* to *New-Orleans*. The policy was underwritten by the defendants, *October* 1798, at a premium of 15 per cent. At the foot of the policy was the following written memorandum. " N. B. The vessel sails under a sea-letter without a register.—Property warranted *American ;* proof to be made here only."

The *Three Friends* sailed on the voyage insured, but sunk suddenly at sea, about 50 miles from *Sandy-Hook*.

The cause was tried at the *New-York* sittings on the 24th *December*, 1804, before Mr. justice TOMPKINS.

On the trial, the plaintiffs, to prove their compliance with the warranty contained in the policy, exhibited a paper called a *certificate of ownership*, and offered witnesses to prove, that according to the usual understanding and acceptance among merchants, at the time when the policy was underwritten, this certificate was a *sea-letter*, within the true intent and meaning of the policy. The defendants' counsel objected to this evidence as incompetent, and contended that a sea-letter was a paper under the seal of the *United*

*a policy of insurance, the plaintiff, by taking it out, will not be precluded from proceeding for a total loss when he informs the defendant's attorney, at the time, of his intention to go for a total loss. Where a bill of exceptions or a special verdict is taken, and a case is also made, the party must make his election to proceed on one or the other, and will not be allowed to argue both.*

*States*, subscribed by the president of the *United States*, and
prescribed by the treaty between the *United States* and
*France*, the 6th of *February* 1778,\* the treaty between the
*United States* and the *United Netherlands* the 8th *October*,
1782,† and between *Spain* and the *United States*, the 20th
*October* 1795,§ the forms of which were annexed to those
treaties respectively.   These *sea-letters* proper, as they
were called, are in four different languages, *English*,
*French*, *Spanish*, and *Dutch ;* some of them were sent by
the secretary of the treasury of the *United States*, in *May*
1793, to the collector of the port of *New-York*.

   Sea-letters of this form were granted by congress in 1784,
and it appeared that a similar one had been given to a vessel
at *Philadelphia*, which sailed from that port on a voyage to
*Curracoa*, in 1797, and another to a vessel which sailed to
*New-Providence* in 1784.—That this document being
known and established by law as a sea-letter, no parol evi-
dence could be admitted to show any understanding among
merchants to the contrary.   The judge admitted the evi-
dence.   Several witnesses deposed that the meaning of the
words " not having a register and sailing with a *sea-letter*,"
was understood among merchants to be, where a vessel was
without a register, or not entitled to a register, but had a
*certificate of ownership*.   Other witnesses considered the
*sea-letter proper* as necessary only in foreign voyages ; that
sometimes both documents were taken.   That the sea-letter
was not an essential, but an accumulative document.   The
certificate of ownership was given by the officers of the cus-
toms, under a general power they have to certify any fact
which is made to appear to them in relation to ships and
merchandize.   The sea-letter was supposed to protect the
vessel and cargo, while the certificate related only to the
cargo.   The form of the certificate has sometimes varied,
but not the substance, and it is granted on the oath of the
master.   Many vessels sailed with *sea-letters*, and with
certificates only, the latter being considered sufficient.

   The defendants' counsel objected to any evidence of loss
on the part of the plaintiffs, or any other evidence, but what
might entitle them to a return of premium.

NEW-YORK,
May, 1806.

I. & C. Sleght
v.
Rhinelander.

\* 25th Article.
† 25th Article.
§ 17th Article.

NEW-YORK,     It appeared, that a case having been made in this cause
May, 1806.   after the former trial, the plaintiffs' counsel declined to argue
I. & C. Sleght   the motion for a new trial, insisting however, that they
v.           were entitled to a return of premium with interest, and that
Rhinelander.  a new trial ought to be awarded for that purpose.   A rule
was entered to that effect, that if the defendants should pay
into court the amount of the premium, they might proceed
to trial, and if they recovered no more than the sum paid
in, they were to pay costs.   Pursuant to this rule the de-
fendants had paid the money into court.   The money
had been taken out by the plaintiffs' attorney, and evi-
dence was offered to show that this had been done by con-
sent of the defendants' attorney, and without prejudice to
the plaintiffs.   It was objected that no agreements were ad-
missible unless in writing ; but the judge allowed the attor-
ney of the plaintiffs to be examined, who deposed that he un-
derstood it to be by consent, and without prejudice to the
plaintiffs' right. The judge thereupon ruled that the plaintiffs
were not precluded by taking the money under this agree-
ment, from proceeding for a total loss.

During the trial the plaintiffs' attorney returned the money
into court. The defendants' counsel, on the evidence produ-
ced, moved for a nonsuit,  but the judge permitted the cause
to go to the jury, who found a *special verdict.*   A bill of
exceptions was also taken.

On opening the argument, *Hoffman* for the plaintiffs,
observed,   that it ought to be confined to the special
verdict.   That where a bill of exceptions, or special verdict
is taken, no case ought to be made.   The party has his elec-
tion to tender a bill of exceptions or make a case, but he
cannot do both.   Having done the former he ought not to
be allowed to argue on the case.   Cases came into practice
with motions for new trials.   If the case be argued, and the
court order a new trial, and the evidence be there overruled,
the plaintiffs will be then compelled to file their bill of ex-
ceptions, and carry the cause to the court of errors, who
may award a *venire de novo,* and the whole ground must be
again travelled over, at great expense and with long delay
to the parties.

. *Harison,* contra.  If the cause rested solely on the bill of exceptions, it might be carried to the court of errors as an appeal from the opinion of the judge at *Nisi Prius,* without waiting for the decision of this court.

NEW-YORK,
May, 1806.

I. & C. Sleght
v.
Rhinelander.

*The Court* said, as this was a new and unsettled point of practice, the counsel might argue this cause both on the case and special verdict, or either, as they thought best.  But they *ordered* that, in future, the party should make his election either to proceed on the special verdict, or on the case made.

*Riggs,* for defendant.  (*Pendleton* on the same side.)— Three points arise in this cause. 1. That the judge admitted improper evidence ; 2. That he mistook the law as arising on that evidence, if it were proper ; 3. Admitting the evidence to be proper, the verdict was against the evidence.

1. By paying money into court, the contract is affirmed, and it admits that the plaintiffs are intitled to the sum paid, leaving only the question to be determined whether they be intitled to more.* The premium having been paid into court, the right of the insured to a return of premium was admitted, and that the defendants were not liable on the policy. When the plaintiffs took the money out of court, they affirmed the act of the defendants, for it was under a rule to pay the *premium,* and not to pay money generally.  Taking the money out of court was conclusive against the plaintiffs, and its having been returned again during the trial did not restore them to their rights, but was rather an acknowledgement that they considered the first act as conclusive.  Though the payment of money into court in a case of unliquidated  damages be irregular, yet if the party take the money out, it is a waiver of that irregularity : And if done by his  attorney or agent without his knowledge, it is as binding on him, as if done by himself.†

* 1 *Term, Cox.*
v. *Parry,* 464.

2. Where the terms of a written contract are clear and explicit, the general rule is well settled, that no *parol* evidence is to be admitted to explain it ; but it must be expounded by the court.  The exceptions to this rule have been admitted with extreme caution.  In regard to a warranty in a policy

† 1 *Term,* 710.
*Griffiths*
v.
*Williams*

of insurance this caution is the more necessary, as it is a fixed principle that warranties are to be strictly and literally complied with. Matters of usage may be proved by witnesses; but their opinion of the meaning of any clause in a policy can never be received in evidence.* The meaning of a written instrument is a question of law, which courts alone are competent to decide. Opinions of men are never evidence. The testimony in this case was improper to prove the commercial import of the words contained in the policy.

*Marshall,609.
Douglas, 511.
Noble v. Kennoway.

A general warranty of *American* property implies, that it shall be documented according to the laws of this country.† If goods be warranted neutral they must be on board of a neutral vessel, which must sail with all those documents, that, according to existing treaties and the law of nations, will entitle her to the privileges of neutrality.†

† Blagge v. N.Y.
Insurance Co.
1 Caines, 564.

By the treaties made between the *United States*, and *France*,† *Spain*,§ and *Holland*,‖ sea-letters or passports are required, without which an *American* vessel cannot claim the privileges of an *American*, but is liable to seizure and confiscation.

† 3 Bos. & Puller,
201. Baring v.
Claggett.
† 8th Feb. 1778.
§ 20th Oct. 1795.
‖ 8th Oct. 1782.

All the witnesses say, that they understood very well the difference between a certificate of ownership, and a sea-letter or passport, and that a sea-letter was as essential to an unregistered vessel as to one that was registered. The former is mentioned as being in *common parlance* a sea-letter; but the jury expressly find that it was such in the understanding of these parties.

*Radcliff and Hoffman*, for the plaintiffs. What is stated in the special verdict is matter of law, and is, therefore, ground for error. What is contained in the case furnishes the basis of a motion for a new trial. The first two points arise out of the special verdict; the third point is that on which the motion for a new trial is to be made.

1. The taking the money out of court did not preclude the plaintiffs from proceeding for a larger sum. If the party pay money into court under a rule for that purpose, he cannot take it back, even though it be paid under a mistake.* There is no reason, then, why it should re-

* Malcolm v.
Fullarton.
2 Term, 645.
Barnes., 281.

main in court; nor can the plaintiffs be prejudiced by taking it out.* Even if the rule were otherwise, it ought not, in the present case, to be applied to the injury of the plaintiffs, as there was an evident understanding on the part of their attorney, that the defendants' attorney consented to its being done without prejudice to the rights of the plaintiffs. If there has been a mistake, the plaintiffs ought not to be concluded by the act of their attorney. The plaintiffs may take out the money paid into court, any time before verdict; after a verdict for the defendants it would, perhaps, be retained as security for the defendants' costs.† Money may be paid into court on a particular count; and, in this case, the premium must be considered as paid on that for money had and received to the use of the plaintiffs, and does not preclude them from proceeding, as for a total loss, on the other count on the policy.‡

2. The object of all evidence in relation to contracts, is to discover the intention of the parties. The general rule as to the admission of parol evidence in regard to written instruments is not to be questioned. But there are many exceptions to this rule and, in all commercial contracts, a more liberal construction has prevailed, conformable to the usage of trade and the real intention of the parties.§ In the case of a charter party, as far back as the reign of Charles I. the court admitted the evidence of merchants as to the meaning of the words, *perils of the sea*, excepted in that instrument.‖ Though in this case the insurance was on the cargo, the waranty emphatically relates to the vessel. Now if a *sea-letter*, according to the commercial sense of that document among merchants, be in fact on board, the court will intend, that there has been a compliance with the warranty. The clause of warranty, like every other part of the contract, is to be construed according to the understanding of merchants and the commercial import of the words.¶ If terms have acquired an appropriate meaning among merchants, *parol* evidence is admitted to show the mercantile sense, in contra-

---

**NEW-YORK,**
**May, 1806.**

I. & C. Sleght
v.
Rhinelander.

* Sellons' Practice. vol 1. p. 307. *Sayer*, 316.

† 1. *Bos. & Puller*. 332. *Le Greu* v. *Cooke*.

‡ 3 *Bos. & Puller* 356. *Muller* v. *Hartshorne*.

§ Abbot. 161. 170.

‖ Abbot 206. *Pickering* v. *Barclay*. 2 Roll. Ab. 248. Style 132. See also 3 Esp. cases, 67.

¶ *Marshall*, 249. See also *Marshall* 148 *Park* 116.

distinction to the strict grammatical, or technical sense. The warranty of *American* property does not require the sea-letter. It has been decided in this court that the warranty is complied with, if the goods be proved to be *American*, though not laden on board of an *American* vessel.

But in relation to the vessel, the certificate of ownership is substantially the same as a sea-letter; all that belligerents can require, is satisfactory proof of its being neutral property. A *passport* and *sea-letter* are different documents.* The former is the most essential. It is not necessary to have all the different documents usually enumerated.† It is enough if the usual and customary documents are found on board. It is the usage for *American* vessels to take sea-letters in voyages to *Europe*; but to the *West-Indies*, and coastwise, they most generally sail with a *certificate* only.

3. The material points in this cause, arise out of the special verdict; and the only question as to the motion for a new trial, is, whether this be a verdict against evidence. The fact of the loss was not disputed by the defendants. *Ferrers*, their agent, to whom they referred the papers, computed it at ninety-eight per cent. His authority to make the adjustment is undisputed, and it ought to be *prima facie* evidence, at least, against the defendants. If a vessel be seaworthy, at the time of her sailing, and afterwards sinks at sea, if the particular cause be unknown, the legal presumption is, that she was lost by the perils of the sea.§ The defendants in this case, have offered no evidence to rebut this presumption. All the witnesses agree in saying, that the paper on board was, in the general and commercial understanding of the word, a *sea-letter*. If the document was in *common parlance* a sea-letter, it was a compliance with the warranty. The jury were warranted in their conclusion that such a paper was on board, according to the agreement of the parties. By the act of Congress,† a certificate is given to unregistered vessels, which entitles them to the same privileges as vessels carrying a sea-letter; and by a supplementary act,§ *passports* are directed to be given to vessels sailing with a *sea-letter* to foreign countries, which plainly

*Marshall* 317.

† See *Hubner,
de la saisie des
batimens neu-
tres, tom.* 1.
part 2. ch. 3.
§ 10.
*Valin des Prises,*
ch. 5. sec. 3. p. 2.
*Azuni, Droit
maritime de
l'Europe,* part
2. ch. 3. art. 4.
§ 11.

§ See the case
of *Patrick* v.
*Hallet & Bowne*
decided this
term, *post.*

† Laws of *U. S.
A.* vol. 6. p. 72.

§ Laws *U. S. A.*
6 vol. p. 219.

distinguishes those two documents. Again, a ship sailing with a *sea-letter*, was entitled to a *Mediterranean* pass ; and it was understood at the custom-house, that a vessel having a *certificate* of ownership, might receive such pass. Thus it appears from the acts of congress, and the officers of the revenue, that such a paper is the same as a *sea-letter*. The verdict of the jury is, in every part, supported by the evidence.

*Harison*, in reply. 1. There was a special rule in this cause, allowing the defendants to pay the money into court. The payment of the *premium* into court, and the taking it out, is a tacit admission, that there was no contract on the policy, and that the plaintiffs had no right to go for a total loss.— They bring their action either for a total loss, or to recover back the *premium* that has been paid. Having made their election, and received the premium, they must abide by it. They cannot blow hot and cold ; at one time affirm, and at another, disaffirm the contract. The mere belief of the plaintiffs' attorney as to the consent of the defendants' attorney, to the taking the money out of court, is entitled to no weight. The rule of this court, requiring all agreements to be written, is a wise and salutary rule, and ought to be enforced.

2. The warranty in the policy is not to be confined to the cargo. It may, perhaps, be a question whether a warranty of *American property* does not imply that the vessel is *American*. If so, it must be a vessel properly documented, or in other words, an *American* vessel. The true meaning of the clause in the policy is, that the vessel, as well as cargo, shall be *American ;* else, why require a document which belongs only to vessels of the *United States ?* It is evident that the parties understood the vessel to be *American ;* and she ought, therefore, to have had the necessary documents of such a vessel for the voyage. It is true, that in a policy on goods, where nothing is said about the national character of the vessel, it has been decided, that they may be laden on board a foreign vessel. This contract was made, *flagrante bello*, and the parties must have had in view a *neutral* vessel, sailing with all the requisite proofs of her neutrality. Though

NEW-YORK, the not having this document on board would not authorise
May, 1806.
a belligerent to seize and confiscate ; yet by certain treaties
I. & C. Sleght between the *United States* and other powers, a passport or
v.
Rhinelander. *sea-letter* proper, in contradistinction to a certificate of owner-
ship, is rendered necessary to prevent their being taken and
carried in for examination. It is a provision for the benefit
of *American* commerce ; and for that reason the insurers
might well stipulate that this paper should be on board. It
was prudent in them to require that the vessel should
be provided with all the documents necessary to pro-
tect the property. The passport or ·sea-letter proper,
as it is called, was framed by the government of the
*United 'States*, to be used by all *American* vessels
in time of war. In 1793, the secretary of the trea-
sury sent these sea-letters to all the custom-house officers, to
be delivered to all *American* vessels, as it was a paper which
foreign powers were bound to respect. The case of *Baring*
v. *Claggett*, 3 *Bos. & Puller* 201, shows the necessity of a
passport in the exact form prescribed by the treaty between
the *United States* and *France*. In fact, both papers were
requisite. The *certificate* of *ownership* to prove the pro-
perty in regard to the custom-house ; and the *sea-letter*, to
evince the nationality of the vessel, and to protect the cargo
from being detained by a belligerent. It is important in this
view, as to the extent of the warranty, to know what is
meant by a sea-letter. *Parol* evidence will never be admit-
ted to explain the terms of a written agreement, unless there
be some latent ambiguity. Where words are susceptible of
a double construction, there witnesses may be called to ex-
† *Coker* v. *Grey*, plain.† Mere opinion can never be received.§ Nor where
2 *Bos. & Pull.*
569. words have a fixed and precise meaning, will resort be had
§ *Carter* v. to merchants for the explanation of the terms. Where
*Bohem*, 3 *Bur-*
*rows* 1918. words have a legal and appropriate sense, it would have a
most dangerous tendency to allow *parol* evidence to give
them a different meaning. Though *parol* evidence is some-
times admitted to explain a particular usage of trade, yet
even in such cases, it will not be received to qualify or con-
troul the clear and unequivocal language of a written in-

strument.† Here the meaning of the words has been settled by the highest legal authority, by solemn treaties, which are paramount to all legislative acts : and this authority must govern, notwithstanding any prevalent mistaken use of the words among merchants. The letter of the secretary of the treasury directs, that sea-letters be delivered to vessels actually and *bona fide* the property of *American* citizens ; and it is regarded as a document of great importance to the commerce of this country. The act of congress§ amending the act relative to drawbacks, declares that the provisions of the former act shall not apply to unregistered vessels, where they possessed at the time a sea-letter, or other regular document issued from a custom-house, proving her to be *American* property. Now a vessel could not have a *sealetter* unless, *bona fide*, *American* property, and possessing that document, there could be no need of another to prove the property. Sea-letters were issued at the custom-house, and no where else. To be entitled to receive it, the vessel must be either *registered*, or have a certificate of ownership. By the act of congress also, *Mediterranean* passes could not be delivered to a vessel unless she had a sea-letter, a document of essential importance to identify the national character. From an examination of all the acts, as well as the treaties, it will be evident, that a precise legal meaning is given to the term sea-letter, and that it is understood by them to be different from a certificate of property.

3. There is no evidence of a loss in this case. *Ferrers* is a mere agent to state cases, compute the amount of losses, but is not authorised to bind the insurers. Their silence cannot be interpreted into an admission of the fact. The vessel has never been heard of, and the action is brought before the time of legal presumption has expired.

When juries undertake to give special verdicts, they ought to find all the facts necessary to enable the court to decide on its true merits. Juries should be held to a strict performance of this duty ; and where the facts are imperfectly stated, the court will not be more unwilling to set aside a special verdict, than where the cause comes before them in the shape of a case made after a general verdict.

NEW-YORK,
May, 1806.

I. & C. Sleght
v.
Rhinelander.

† *Marshall*,170.

§ Laws *U. S. A.*
vol. 6. p. 72.

NEW-YORK,
May, 1806

I. & C. Sleght
v.
Rhinelander.

SPENCER, J. delivered the opinion of the court. This cause has been argued, on the special verdict, and for a new trial, on the ground that the verdict is not warranted by the facts proved.

Several points have been made which I shall examine in the order they were raised.

The effect of the taking the money out of court by the plaintiffs' attorney, and his explanation of the circumstances under which it was taken out, are first to be considered ; and this involves the import and meaning of the rule of this court under which the money was paid in.

When the rule was made, no doubt it was the impression of the court, as well as of the plaintiffs' attorney, that nothing was in controversy between the parties but the premium ; and on that, the court were of opinion, interest ought not to have been demanded. The rule, however, is in the common form, and had not the plaintiffs recovered for a loss, they would have been obliged to pay all their own costs, and those of the defendants posterior to the entry of the rule ; but the court did not intend to deprive the plaintiffs of a right to go for a total loss, if they thought proper: they went on at their peril as to the costs. Had the premium been the only question, and the attorney had taken out the amount paid into court, it would have been the act of the party and would have concluded him. The language of the rule ought not to operate against the rights of the adverse party ; it is, substantially, a rule for the payment of a specific sum, and a decision that for the premium, interest should not be allowed. When, therefore, the attorney of the plaintiffs took out the money, having previously informed the defendants' attorney that the plaintiffs meant to go for a total loss, to construe the act of receiving the money, as an affirmance of the plaintiffs' right to the premium only, would appear to me, to be unreasonable and unjust. I am of opinion, therefore, that the taking out the money did not prejudice the plaintiffs' right to proceed for a total loss.

The next objection to the verdict is, that *parol* proof
was inadmissible to explain the commercial import of the
*nota bene;* " The vessel sails under a sea-letter, without a
register."

It appears to be well ascertained, that a sea-letter is, in truth, a document furnished by the custom-house, under the signature of the president of the *United States*, and the secretary of state ; and that the paper which the plaintiffs had on board when the vessel sailed, was a certificate of *American* ownership, under the signature of the collector of the customs. It is not denied that this *nota bene* was a warranty, and that if the vessel had not what, in judgment of law, is a sea-letter, then the warranty being broken, the policy is rendered void.

The *parol* proof goes to shew, that in the year 1798, in *common parlance*, the certificate of ownership was a sea-letter ; but that the difference between them was understood by most merchants. To the effect of this proof the defendants object, because, it is an attempt to explain away the meaning of words that have a precise and legal import.

The usage of trade is, certainly, very properly resorted to in a variety of cases, in commercial questions ; but in a case situated like the present, in my opinion the *parol* proof offered, ought not to have been admitted, or if admitted, the jury should have been charged not to regard it.

It is of the first importance in all cases of contracts, to ascertain the sense and meaning of the parties to the contract. When they reduce their agreement to writing, they are bound by the legal import of the terms they employ to express their meaning ; otherwise, one party might allege that he had one conception of the purport of the contract, and the other might insist on a different conception. When this contract was entered into, such papers were known, as a sea-letter, and a certificate of ownership ; their difference was well understood by merchants, and it appears, that they generally considered a certificate of ownership not to be, properly speaking, a sea-letter. It

NEW-YORK, does not appear that the defendants had such a conception,
May, 1806. or fell into the error of considering the one of these papers,
I. & C. Sleght as the other. It would, in my apprehension, be a departure
v. from all rules of law, to admit an understanding or error
Rhinelander. of this kind to prevail, against the certain, the known and
legal import of the words. Though in commercial
questions, I would pay every attention to the usage of a
particular trade, when necessary to give effect to the inten-
tion of parties, I never can consent to explain away the
clear and unequivocal language of this warranty, not in
the least ambiguous, because, some merchants may have
perverted the meaning of the term sea-letter, well known
in our laws, and specially provided for in our treaties.

From the terms of the special verdict, it appears to me
that there must be a new trial. It states that the vessel
insured sailed under a sea-letter, according to the terms of
the policy, and the true intent and meaning of the parties ;
and that the sea-letter proper was not intended by the pol-
icy, or the parties, to be on board, and that the same was
not required to be on board, according to the commercial
import of the terms. These facts are founded on the *pa-
rol* proof I have taken notice of, and that proof by no
means justifies the assertion in the verdict, that the vessel
*sailed* under a sea-letter according to the terms of the
policy, and the true intent and meaning of the parties. On
the ground, therefore, that *parol* proof was admitted to ex-
plain terms perfectly understood, and to give them a sense
different from their legal import, a new trial must be
granted, with costs to abide the event of the suit.

New trial granted.