## BARLOW vs. LAMBERT.

[ACTION ON NOTE GIVEN FOR THE HIRE OF A SLAVE.]

1. *Common law, how far in force in this State.*—The common law of England, as changed and modified by our statutes, is part and parcel of the law of this State, so far as applicable to our institutions and government.

· 2. *Evidence of custom, admissibility of.*—Evidence of a local custom is admissible, to supply details in a contract, either oral or written, as to which the contract itself is silent; or to show that provincialisms, and technicalities of science and commerce, have acquired a known, fixed, and definite meaning, different from their ordinary import; or where such technicalities, unexplained, are susceptible of two or more reasonable constructions: but it cannot be received to contravene any positive requirement of the law, any principle of public policy, or an express contract, whether oral or written, nor to give to plain and unambiguous words or phrases a meaning different from their natural import; and it is therefore inadmissible to show that a stipulation, in a contract of hiring, that the hirer was to "lose the negro's lost time," "related to time lost by sickness or running away, and not to time lost in consequence of the negro's death."

3. *General objection to evidence.*—If evidence is offered as a whole, when a portion of it is illegal, the court may, on objection, exclude the whole of it.

APPEAL from the Circuit Court of Mobile.

Tried before the Hon. C. W. RAPIER.

THIS action was brought by Andrew Lambert against Robert Barlow and Uriah Barlow, and was founded on the defendants' promissory note for $175, dated January 1, 1853, and payable twelve months after date. The pleas were, a tender before suit brought, and the general issue, with leave to give any special matter in evidence as a bar to the suit. It was proved on the trial, that the note was given for the hire of a slave; and the witness who testified to the contract of hiring, one J. F. Boyles, stated, that at the time the contract was made, and before the note was executed, "plaintiff told defendant that he (defendant) would have to lose the negro's lost time, without specifying how that lost time might occur,— whether by death or otherwise; and that defendant agreed to it,—saying, that he would lose that time of course." The defendants offered two witnesses, "to prove that the words, 'lose the negro's lost time,' as used in the contract of hiring

to which Boyles testified, had a general and well understood meaning in Baldwin county, where said contract was entered into; and that they related to time lost by sickness or running away, and not to time lost in consequence of the negro's death. They also offered evidence to prove a general and well known custom in said county, where a hired negro died during the year for which he was hired, for the owner to deduct all time from the period of the negro's death; which testimony the court ruled inadmissible, and the defendants excepted. The defendants also proved, that said negro died, during the year, without their fault. The court charged the jury, that the plaintiff was entitled to recover the full amount of the note, with interest, unless they believed from the evidence that plaintiff, when he hired said negro, agreed to make an abatement for the time lost by the negro in case he should die before the expiration of the year."

WM. G. JONES and ROBT. B. ARMISTEAD, for the appellant:

Two questions are presented on the record: 1st, whether the evidence offered to show a local custom, which was excluded by the court, was admissible; and, 2d, whether the charge of the court is correct.

1. The custom was reasonable, general, and well known; and the evidence, therefore, ought to have been received.—Adams on Contracts, 151–2; Partridge v. Forsythe, at present term.

2. The question presented by the charge of the court has never been directly decided in Alabama. In Perry v. Hewlett, 5 Porter, 318, it is said that the owner may recover the whole hire, though the slave die before the expiration of the term; but an examination of the case will show that this is a mere *dictum*. The weight of authority, especially in the slaveholding States, is strongly and decidedly in favor of the principle, that the hire should be apportioned, and that the owner should recover only for the time the slave lived.—George v. Elliott, 2 Hen. & Munf. 5; Bacot v. Parnell, 2 Bailey, 424; Dudgeon v. Teass, 9 Missouri, 857; Collins v. Woodruff, 4 Eng. (Ark.) 463, cited in 10 U. S. Digest, 59, § 23. The doctrine of apportionment seems most just and equitable, and most consistent with principle. The case of Harrison v. Murrell,

5 Monroe, 380, which holds the contrary doctrine, goes upon a mistaken analogy to the renting of real estate, and supposes the hirer to acquire a title to the thing itself that is hired. It is rather a contract for services to be rendered, and the hirer acquires only the title to the temporary use of the thing. The hirer of a carriage from a livery-stable, for an hour, a day, or a week, gets no title to the carriage itself, but only a right to use it temporarily; and if the horses, on leaving the stable door, run off, and break it to pieces, without his fault, he is not bound to pay the whole hire. Why should a contract for the services of a slave be different? Hiring is a contract of bailment; renting, or leasing, is not. The bailor may maintain trespass or trover, for an injury to, or conversion of the thing, whilst in the actual possession of the bailee; a landlord, or lessor, cannot.—3 Stephens' N. P. 2632, 2636; 9 Bacon's Abr. 454–5; Booth v. Terrell, 17 Ga. 20.

Wm. Boyles, contra:

1. The hirer of a slave for a definite period is a purchaser for the term; if the slave die before the expiration of the term, the loss must be borne by the hirer; and he cannot resist a recovery, by showing that the act of God prevented him from deriving a benefit from the contract, unless by its terms provision is made for such a contingency.—8 Porter, 133.

2. A particular usage may be given in evidence, to influence the construction of a contract, or to explain the sense in which words or terms are used; but, when the contract is established, and is not governed by the commercial law, it is not allowable to change its character, and to attach to it conditions in opposition to established rules of law.—Petty v. Gayle, 25 Ala. 472. No offer was made, in this case, to show that the custom had existed for any length of time.—Center & Co. v. Jewell, 26 Ala. 506; Partridge v. Forsythe, at present term.

STONE, J.—The constitution of the State of Alabama (Art. II, § 1) declares, that "the powers of the government of the State of Alabama shall be divided into three distinct departments, and each of them confided to a separate body of magistracy—to-wit: those which are legislative to one; those which are executive to another; and those which are judicial

to another." The first section of the third article contains. this language: "The legislative power in this State shall be vested in  *   *   *   the general assembly of the State of Alabama." · By the "schedule" attached to the constitution of the State, (§ 5,) the "territorial laws, not repugnant to the constitution," were continued of force.

The acts of 1828 and 1832, (Clay's Digest, p. 383, §§ 11, 17,) adopted the rules of the law merchant, as to days of grace, demand, protest, and notice, so far as the same affect bills of exchange, and bonds and other instruments payable in bank. The Code (§§ 1525, 1526) adopts the "commercial law," as governing the same classes of instruments, with provisions somewhat variant.

The Code superseded all the "acts of a public nature," theretofore passed, and which were "designed to operate on all the people of the State, not embraced in said Code"; except that the acts of the legislature passed at the session of 1851-2, whether approved before or after the adoption of the Code, were not repealed or affected by the Code, "but such laws supersede any provision of the Code with which they conflict."—Code §§ 11, 12.

In Cawood's case, 2 Stew. 360, this court held, that under the 2d "article of the ordinance of 1787, "which was afterwards made the fundamental law of" this territory, "the common law of England, so far as applicable," was made a rule of action for our government, "both in civil and criminal cases." By a series of decisions, running through our entire judicial history, the above doctrine has been firmly established ; and it must now be admitted, that the common law, qualified as above, is part and parcel of the law of this State.

We believe we have thus exhibited the sources, organic and written, from which our rules of action are mainly derived. The constitution, in the distribution of the "powers of the government," having conferred the "legislative power" on the "general assembly," the question may arise, Under what authority, by what warrant, are we brought under the dominion of other *rules of action?* Is it sound, is it consistent with the genius of our government, that any portion of the community less than the whole—any city, town, village, or neighborhood—shall exercise powers which the constitution has con-

ferred alone on the general assembly? Shall such "portion of the community" make unto themselves a law which shall overrule the general law? It becomes us to feel our way cautiously, lest there grow up in our midst some *third estate*, which shall, in time, usurp the government.

While we are not prepared to say that "customs," or "usages," for certain purposes, and under certain restrictions, may not, and do not, rightfully exist, we own ourselves "no friends to the almost indiscriminate habit, of late years, of setting up usages, or customs, in almost all kinds of business or trade, to control, vary, or annul the general liabilities of parties under the common law, as well as under the commercial law."—The Schooner Reeside, 2 Sumner's R. 567.

Like most other subjects, on which the minds of men differ, the decisions of the courts, defining what usage or custom may or may not do, have been far from uniform. Much confusion and inaccuracy have crept into the adjudged cases, so that any attempt to reconcile them would necessarily prove abortive. Custom, long acquiesced in, and sanctioned by judicial decision, has given us the systems of laws known as the common law and the law merchant. These systems are judicially taken notice of, and are not the subject of proof.—Hogan v. Reynolds, 8 Ala. 59. These systems, then, may be declared to have obtained the dignity of law. Local customs, or particular usages, can claim no such eminence. They are not, and cannot become, a rule of action "prescribed." They never assume a character so binding, as that parties cannot, by agreement, place their contracts without their influence. So, when custom and contract come in conflict, the latter prevails over the former. They are, at most, but a part and parcel of the contract,—the subject of proof like other facts,—and are only binding, because they are a part of the contract. Not that the proof in each case shows that the parties, *in fact*, incorporated the custom into their contract; but that by the testimony, it is shown that the particular custom is so general and so known, as to raise the inference that the parties knew of its existence, and contracted with reference to it. It is, in effect, nothing more than one means of establishing a material fact; a case of presumptive evidence. The fact to be established is, that a certain element or stipulation entered into

the contract or agreement of the parties. That element or stipulation was either not expressed in the contract, or, if expressed, the parties either can not, or do not, offer proof of the direct fact. In such case, the rule declares that proof may be made of the local custom or usage, in order that from its existence the supposed element or stipulation may be safely and satisfactorily deemed to be incorporated into the contract. If the proof fail to raise this inference, it should be regarded as insufficient. When custom has been sufficiently proved, it becomes a part of the contract, not *the law* of the case.—Jones v. Fales, 4 Mass. R. 252; Halsey v. Brown, 3 Day, 346.

It follows from what is said above, that custom cannot overturn the positive requirements of the law, or the express contracts of the parties, whether the contracts be evidenced by writing or not.—Renner v. Bank of Columbia, 9 Wheat. 587. Neither can custom contravene any principle of public policy.—Luarden v. Warder, 3 Rawle 107; Dunham v. Day, 13 Johns. 44; Gallatin v. Bradford, 1 Bibb, 209; Williams v. Gillman, 3 Greenl. 281; Waters v. Lilly, 4 Pick. 145.

Evidence of custom cannot be received, to give to plain and unambiguous words or phrases a meaning different from their natural import.—Schooner Reeside, 2 Sum. 567; Turney v. Wilson, 7 Yerg. 340; Ivey v. Phifer, 13 Ala. 824. This principle rests on a sound public policy. Oral evidence cannot be given to vary or contradict, enlarge or qualify a written contract, or to prove that the parties intended differently from the legal import of their language, although witnesses may testify, directly and positively, to such different intention. Neither can such result be attained indirectly, by proof that a local custom exists, and has become so known and general, that parties are presumed to have contracted with reference to it, and thus made the custom a part of their agreement. The former is an offer to make direct proof of an inadmissible fact; the latter, an effort to prove circumstances, or facts, from which to infer *the fact*, which, when offered directly, is inadmissible. The statement of such a proposition is its refutation.

We hold, then, that proof of custom may be received, to supply the details of a contract, either written or oral, where

the contract is silent in its details, unless such custom contravene the positive requirements of the law, or some principle of public policy.—The Schooner Reeside, 2 Sumner, *supra;* Jones v. Fales, 4 Mass. 243; Rankin v. Amer. Ins. Co., 1 Hall's Rep. 619; Gibson v. Cuyler, 17 Wend. 305; Ala. & Tenn. Rivers Railroad Company v. Kidd, and Partridge v. Forsythe, at the present term.

It may also safely be laid down, that where by local custom, or usage, provincialisms, and technicalities of science and commerce, and perhaps some others, have acquired a known, fixed, and definite meaning, different from their ordinary import; or, where such technicalities, unexplained, are susceptible of two or more plain and reasonable constructions, it is certainly competent to prove the existence of such custom, as a means of showing the sense in which the contracting parties intended to be understood.—Murray v. Hatch, 6 Mass. 465; Winthrop v. Union Ins. Co., 2 Wash. Cir. Ct. Rep. 10; Sleght v. Rhinelander, 1 Johns. 192; Boorman v. Johnson, 12 Wend. 572; Cowen & Hill's Notes to Phil. Ev. 3 vol. p. 1409; Barger v. Caldwell, 2 Dana, 130.

We are aware that, in some adjudged cases, principles are asserted in conflict with some of the rules expressed above. The same remark may be predicated of some loose *dicta* found in other cases, and some of the elementary writers. Of this class are the following : Middleton v. Heyward, 2 Nott & Mc. 9; Bank v. Paige, 9 Mass. 155; Homer v. Dorr, 10 Mass. 26; Bouv. L. D., "Custom," and cases cited; United States v. McDaniel, 7 Peters, 15; Coit v. Com. Ins. Co., 7 Johns. 385; Boorman v. Johnson, 12 Wend. 572; Smith v. Wilson, 3 Barn. & Adol. 728; Cutler v. Powell, 6 T. R. 320. A *dictum* in Price v. White, 9 Ala. 563, is perhaps obnoxious to this criticism.

The words testified to by the witness Boyles, as a part of the contract of hiring, that the hirer was to "lose the negro's lost time," are plain and unambiguous. They have but one legitimate meaning, and it was not permissible to give to them a different meaning, either by direct or indirect proof, as was proposed in this case. If the contract had been silent on the matter of the negro's lost time, we do not say that the alleged local custom of Baldwin county, was not a legitimate subject

of proof, if offered alone. It was not so offered, and we need not now decide that question.

There is no error in the record, and the judgment of the circuit court is affirmed.