## McCLURE & CO. *vs.* COX, BRAINARD & CO.

[ACTION AGAINST COMMON CARRIERS FOR LOSS OF COTTON.]

1. *Admissibility of parol evidence of custom in construction of bill of lading.*—Parol evidence is admissible, to show that the words "dangers of the river," as used in a bill of lading, by usage and custom included dangers by fire.

2. *Same.*—Where a bill of lading recites that cotton was shipped on a steamboat, parol evidence is admissible, to show that it was customary for steamboats, when the river was low, to carry barges in tow, and to store freight, at their option, on either the boat or the barge. (STONE, J., *dissenting.*)

3. *Requisites of custom.*—The "universal practice and understanding of persons employed in navigating" a particular river, does not, *per se*, constitute a custom.

APPEAL from the City Court of Mobile.

Tried before the Hon. ALEX. McKINSTRY.

THIS action was brought by the appellants, to recover damages for the loss of five bales of cotton, which were shipped at Claiborne, on board of the steamboat *Pink Toney*, of which the defendants were the owners, consigned to the plaintiffs at Mobile, and never delivered to them. The only plea was the general issue. The rulings of the court on the trial, which present all the points covered by the assignments of error, are thus stated in the bill of exceptions:

"On the trial of this case, the plaintiffs introduced in evidence the bill of lading hereto attached, marked 'exhibit A,' which is made a part of this bill of exceptions, and proved that it was signed by the clerk of the steamboat *Pink Toney;* also, that the cotton sued for was delivered to the officers of said steamboat, to be carried from Claiborne to Mobile; that the defendants were the owners of said boat at the time; that the cotton was worth fifty dollars per bale; that the consignees had demanded said cotton of the officers of the boat, who failed to deliver it, saying that it had been burned up. The defendants offered in evidence the depositions of Wm. P. Lesslie and Elijah E. Robinson, copies of which are hereto attached,

40

marked 'exhibits B' and 'C.' The plaintiffs objected
to any evidence of a custom that fire was one of the dan-
gers of the river; but their objection was overruled by
the court, and they excepted. The plaintiffs objected,
also, to each and every part of said depositions, which
spoke of a custom to carry cotton on a barge, when a bill
of lading had been given to have it transported on a
steamboat; which objection was overruled, and the
plaintiffs excepted. Said depositions were then read to
the jury. ·

"The defendants then offered evidence tending to show,
that said cotton was put upon a barge which said boat
towed in low water, upon which freight was carried; that
the risk on the barge was no greater than on the boat;
that the insurance offices made no difference between
freight on said barge and freight on said boat; that
said barge classed _A No._ 1; and that when cotton was
insured on such a bill of lading, the insurance offices
made no difference, in either their rates or liabilities,
whether the cotton was put on the boat, or on the barge
in tow. There was, also, evidence tending to show,
that said steamboat, on her downward trip at the time
said cotton was lost, took on board a lot of cotton a short
distance above Claiborne, and gave a receipt for it to the
effect that it was to be transported on the said boat or
barge; that one of the clerks had given a bill of lading,
stating that it was· shipped on the boat and barge; and
that this, though not the usual practice, was considered
as making no difference in practice. There was some
evidence tending to show, that the cotton was put on said
barge; that said barge took fire before it reached Mobile,
and the cotton was destroyed; and that the steamboat
came safe to Mobile. There was some evidence tending
to show, that the fire was accidental, and that there was
no negligence in the officers of the boat. The proof
showed, that the cotton on the barge had no cover on it.
A witness was asked, on cross examination, if he ever
knew of a case like this; to which he replied, that he did
not. There was evidence tending to show, that it was the
universal practice and understanding, when a boat had a

barge in tow, that the freight was to be put on the barge
or boat.

"Upon this evidence, the court charged the jury, among
other things, that if they believed from the evidence that
it was the universal practice and understanding on the
Alabama river, among persons employed in navigating
said river, when a boat had a barge in tow, to put cotton
on the boat or barge; and that there was not any greater
risk to the owner of the cotton by putting it on the barge;
and that the cotton on the barge took fire by accident,
without any fault or negligence of the officers of the
boat,—then they should find for the defendants: that the
carrier, in such case, would not be liable for the cotton
so burnt, because it was put on the barge instead of the
boat, if the carrier had conformed to what was the usage
of the trade in this respect.

"The plaintiffs excepted to the foregoing charge, and
to every part thereof, and then asked the court to charge
the jury, that fire was not one of the dangers of the river,
within the meaning of the exception of the bill of lading.
This, the court said, might be true; but instructed the
jury, that if they believed from the evidence that it was
the understanding of all parties engaged in the trade of
the Alabama river that accidental fire was one of the
dangers of the river, and that in the steamboat trade on
that river, the words 'dangers of the river,' as used in
the bill of lading, were understood to include the risk of
accidental fire, and not understood or considered by the
shippers and others [as] creating a liability for loss by ac-
cidental fire,—then the carrier would not be liable for
such accidental fire, under the terms of the bill of lading
as so explained, and with such understanding proved; to
which charge the plaintiffs excepted.

"The plaintiffs asked the court to charge the jury, also,
that if they believed from the evidence that the cotton
was not put on the said boat, but was put on a barge, and
was destroyed on the barge, then the defendants were
liable. [The court refused this charge,] and instructed
the jury, that if they believed it was usual and customary
in that trade for boats to have such barges in tow at such

stages of the water, and that it was the common under-standing that steamboats had the privilege of storing the cotton on the one or the other at their option; and that such practice was universally known and understood by shippers; and that the boat had placed the cotton on the barge in accordance with the usage and custom as under-stood under such bill of lading,—that the [defendants] would not be liable because of its being put on the barge instead of the boat. Plaintiffs excepted, and now pray the court to sign and seal this bill of exceptions," &c.

The exhibits referred to in the bill of exceptions are not incorporated in the transcript, but there is an agree-ment of record, signed by the counsel of both parties in this court, to the following effect: "It is agreed, that the depositions of Lesslie and Robinson contained the orig-inal bill of lading for the cotton; that said bill of lading recited that the cotton was shipped on the steamboat *Pink Toney*, and was in the usual form, with the stipula-tion 'dangers of the river navigation excepted,' (but no clause as to fire;) that the steamboat had a barge in tow, the water being low. The depositions contained evidence conducing to show, that it was usual and customary for boats, in low water, to have and use barges in tow; that this was known to the shipper, who was the warehouse-man, and who was present when the cotton was put on the barge; and that it was considered the usual privilege of the boat so to carry it. They went to establish, also, that the usual understanding of the words 'dangers of the river navigation,' in the bill of lading, included acci-dental fire in steamboat navigation; and that the carrier was not liable for fire, under such a bill of lading, by the understanding of those engaged in that trade."

All the rulings of the court to which exceptions were reserved, as above stated, are now assigned as error.

WILLIAM BOYLES, for the appellants.

GEO. N. STEWART, *contra.*

RICE, C. J.—It is settled in this State, that it is per-missible for the owner of a steamboat, when sued for the

loss of goods by fire, to show by parol, that the exceptive words, "dangers of the river," in a bill of lading, by custom and usage include dangers by fire.—Samspon & Lindsay v. Gazzam, 6 Porter's R. 123; Hibler v. McCartney, at the last term, reported in 31 Ala. 501.

[2.] "In mercantile contracts, as to *the subject-matter of which known usages prevail*, parties are found to proceed with the tacit assumption of those usages.  They commonly reduce to writing the special particulars of their agreement, but omit to specify these known usages, which are included, however, as of course, by mutual understanding.  Evidence, therefore, of such incidents, is receivable.  The contract, in truth, is partly express, and in writing; partly implied, or understood, and unwritten. Such contracts are very commonly framed in a language peculiar to those engaged in the particular trade out of which they arise."  "The intention of the parties, though perfectly well known to themselves, would often be defeated, if this language were strictly construed according to its ordinary import in the world at large.  Evidence, therefore, of mercantile custom and usage, is admitted *to expound it, and to arrive at its true meaning.*"  "But, in these cases, a restriction is established on the soundest principle, that the evidence received must not be of a particular which is *repugnant to*, or *inconsistent with*, the written contract.  Merely that it varies the *apparent* contract, is not enough to exclude the evidence; for it is impossible to add any material incident to the written terms of a contract, without altering its effect, more or less."  Neither, in the construction of such contracts, will the evidence be excluded "because the words are, in their ordinary meaning, unambiguous; for *the principle of admission is, that words, perfectly unambiguous in their ordinary meaning, are used by the contractors in a different sense from that.*"  The best test, by which to determine the existence or non-existence of *such repugnancy* or *inconsistency* as will exclude the proposed evidence of the custom and usage, is, to inquire whether *the explanation* furnished by the evidence is "such as, if expressed in the written contract, would make *it insensible or inconsistent.*"—Brown v. Byrne, 3 Ell.

& Bl. (77 English Com. Law Rep.) 704 ; Humfrey v. Dale,. in the court of Queen's Bench, January, 1857, reported in July No. 1857, of the American Law Register; Renner v. Bank of Columbia, 9 Wheaton, 581 ; Brown v. Brown,. 8 Metc. R. 573 ; Smith & Holt v. Mobile Nav. and Mut. Ins. Co., 30 Ala. 167; Marine Dock and Mut. Ins. Co. v. McMillan & Son, 31 Ala. 711 ; same case, 27 Ala. R. 77 ; see, also, the notes to Wigglesworth v. Dallison, 1 Smith's Leading Cases, 677, 685 ; Barber v. Brace, 3 Conn. R. 10.

With the law as above laid down for our guidance, we are now to consider, whether the court below erred in permitting the defendants, after the bill of lading had been read in evidence, reciting that the cotton was shipped on the steamer *Pink Toney*, to introduce evidence tending to show, " that the steamboat had a barge in tow, the water being low; that it was usual and customary, for boats to have and use barges in tow in low water; that this was known to the shipper, who was the warehouseman, and who was present when the cotton was put on the boat; that it was considered the *usual privilege of the boat so to carry it;* and that it was the universal practice and understanding, when a boat had a barge in tow,. that the freight was to be put *upon the barge or the boat."*

It is evident, that this evidence tended to show a custom of the particular trade ; that the parties to this suit, at the time of the contract evidenced by the bill of lading, were cognizant of that custom ; that they contracted with a tacit reference to it ; and that, *in fact,* the very contract on which the plaintiff founds his right, was made *with the usage or custom understood to be a term in it.* " To exclude the usage, is to exclude a material term of the contract, and must lead to an unjust decision. It is (as Lord Campbell, C. J., says) " the business of courts reasonably so to shape their rules of evidence, as to make them suitable to the habits of mankind, and such as are not likely to exclude the actual facts of the dealings between parties when they are to determine on the controversies which grow out of them."—See Humfrey v. Dale, *supra.*

It may be exceedingly difficult to draw the precise line of distinction, between cases in which evidence of usage

and custom ought to be admitted, and cases in which it ought not to be admitted; but there can be none in saying that there are cases in which such evidence must be received. And in perhaps the strongest English case against such evidence, Lord Denman, C. J., was not willing, in view of the authorities, to put his opposition to it in stronger language than the following : " But the cases go no further, than to permit the explanation of words *used in a sense different from their ordinary meaning*, or *the addition of known terms* not inconsistent with the written contract."—Trueman v. Loder, 11 Ad. & Ell. 589; see, also, Barlow v. Lambert, 28 Ala, 704, which certainly goes no further than Trueman v. Loder.

Now, it seems clear, that the evidence of usage and custom, offered in the present case, does not labor under the objection of introducing any thing *repugnant to*, or *inconsistent with*, the tenor of the written contract, in the sense in which we have above defined repugnancy or inconsistency—the sense in which that objection must be understood in cases of this kind. That evidence goes no further than to furnish " the explanation of words *used (in the bill of lading) in a sense different from their ordinary meaning*, or *the addition of known terms* not inconsistent with the written contract." It tends to show that the words " on the steamer," used in the bill of lading, were used "in a new, peculiar, or technical sense " in the particular trade; and that, by this new, peculiar or technical sense, the barge towed by the steamboat in low stages of water, was included in the term steamer or steamboat, so far at least as to secure to the commander of the boat *the privilege* of stowing the cotton on either the boat or barge. If the explanation or addition, thus derived from the evidence of the custom, had been expressed in the bill of lading, it would not have rendered the bill of lading *insensible* or *inconsistent*. It is obvious, that the bill of lading would not be rendered insensible or inconsistent, by the expression therein of *the privilege to the commander of the steamboat* to stow the cotton on the boat, or on the barge towed by her, in accordance with the custom.

[3.] Applying the law as above laid down to the case as

presented by the record, it is the opinion of a majority of the court, that there is no error, except in the charge first excepted to. That charge is understood by a majority of the court to authorize a verdict for the defendant, upon proof of "the universal practice and understanding of *persons employed in navigating said river*," to carry cotton on the barge in tow, without proof that any word or phrase of the contract had, by virtue of a lawful custom, come to be understood in a sense which gave the carrier a right to carry on the barge. That charge makes the case turn upon the practice of the *carriers*, and *their* understanding of that practice, varying the contract; and not upon the right of the carrier, under the contract, when explained and expounded in reference to the peculiar meaning of its words, as established by a valid custom. And in this respect, that charge was erroneous.

As the cause must be remanded for another trial, we deem it proper to say, that we do not wish to be understood as passing upon the sufficiency of the evidence to establish the customs in dispute. We decide nothing more than that the evidence objected to was, on account of its tendency, admissible; and that, in view of the evidence, all the charges and refusals to charge were appropriate and free from error, except the first charge, the error of which we have above pointed out. For that error, the judgment is reversed, and the cause remanded.

STONE, J.—In Trueman v. Loder, 11 Adol. & Ellis, 589, it was said by Lord Denman, that "the cases go no farther, than to permit the explanation of words used in a sense different from their ordinary meaning, or the addition of known terms not inconsistent with the written contract." As I understand the testimony in this case, it makes no attempt or pretense that the words "*on the steamer Pink Toney*" were used *in a sense different from their ordinary meaning*. I think the testimony, properly construed, proves nothing more than a *habit* with steamboatmen, in low water, to carry cotton at their option either on the boat or on the barge in tow. It falls far short of proving that these words, in mercantile usage,

had a well-known meaning peculiar to the trade.—See Brown v. Byrne, 3 Ell. & Bl. 702.

I think the term, attempted to be interpolated, is *repugnant to*, and *inconsistent with*, the express terms of the written contract. The contract binds the boat-owners to carry the cotton *on the boat*. The custom relied on would relieve them from carrying the cotton on the boat. This is not the interpolation of a term, consistent with the terms of the written contract.—See Thorpe v. Sughi, at the present term, and Smith & Holt v. Mobile Navigation and Mutual Insurance Co., 30 Ala. 167.

I do not think "a universal practice and understanding on the Alabama river, among persons employed in navigating the said river, that when a boat had in tow a barge, to put cotton on the boat or the barge; and if the jury further believe there was not any greater risk to the owners of the cotton by putting it on the barge, and if the cotton on the barge took fire by accident, and without any fault or negligence of the officers of the boat," entitled the defendants to a verdict.

I do not think the *universal practice and understanding*, *among persons employed in navigating said river*, and the *equality of risks* on the boat and the barge, are sufficient ingredients to constitute a binding custom. If this be law, it would seem to follow, that universal practice and understanding among a particular class of contracting parties, that they are permitted to violate an express term of the contract, if the violation involve no probable injury to the other party, authorizes them thus to violate their contract; and the fact that such violation does result in damage to the other party, will impose no liability on the party thus violating his contract, unless, in addition to such violation, he was also guilty of negligence. I cannot assent to such test of liability.

I concur in the general statement of legal principles as declared by the chief-justice. I think a controlling fault in the drift of the evidence is, that it substitutes the habit of boatmen for a custom of trade.—See Barlow v. Lambert, 28 Ala. 704; Bazin v. Liverpool and Philadelphia Steamship Co., Law Register for June, 1857, p. 459.